PITTSBURGH REALTY INVESTMENT TRUST, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1786–73, 9887–74.   Filed November 22, 1976.

*Leonard Boreman** and *Charles E. Wittlin,* for the petitioner.

*Joseph M. Abele,* for the respondent.

DRENNEN, *Judge:* In docket No. 1786–73, respondent determined that petitioner was liable as a transferee for a deficiency of $38,189.48 in income tax due from College Housing, Inc., for the short taxable period January 1, 1968, through September 30, 1968. In docket No. 9887–74, respondent determined that petitioner was liable as a transferee for the same substantive deficiency of $38,189.48 due from College Housing, Inc., as in docket No. 1786–73 but for the taxable year beginning January 1, 1968, and ending December 31, 1968.[1] The primary issue raised in these consolidated

---

* Leonard Boreman died on Dec. 26, 1975.

[1] The notice of liability in respect of docket No. 9887–74 further states:

"If the existence of College Housing, Inc. terminated for Federal tax purposes in 1968 prior to December 31, 1968, the above deficiency is determined for the taxable

cases is the question of petitioner's status as a transferee under section 6901, I.R.C. 1954;[2] specifically, we must decide whether the form of the transaction whereby petitioner purchased all of the stock of College Housing, Inc., and then liquidated College Housing, Inc., is to be respected so as to render petitioner liable as a transferee within the ambit of section 6901 or whether the transaction is to be viewed as in substance a purchase of assets by petitioner to which, as a purchaser, section 6901 does not apply. If petitioner is a transferee within the meaning of section 6901 and, as such, liable for the deficiency which itself is not in dispute, we must then ascertain to which taxable period, that of docket No. 1786–73 or of docket No. 9887–74, the deficiency properly relates in order to further determine whether the respective notice of liability was timely issued within the applicable statute of limitations.

### FINDINGS OF FACT

Certain facts have been stipulated by the parties and are accordingly so found.

Pittsburgh Realty Investment Trust (hereinafter referred to as petitioner or PRIT) is a real estate investment trust organized under the laws of the Commonwealth of Pennsylvania pursuant to a Declaration of Trust dated February 1, 1966, and qualifying as a real estate investment trust pursuant to section 856, et seq. Petitioner's principal place of business at all times and as of the date the petition was filed herein was in Pittsburgh, Pa. Petitioner's income tax return for its taxable year December 1, 1967—November 30, 1968, was filed with the Internal Revenue Service Center at Philadelphia, Pa.

College Housing, Inc. (hereinafter referred to as CHI), was incorporated on September 27, 1965, under the laws of the Commonwealth of Pennsylvania. CHI owned and operated college dormitories at Indiana University, Indiana, Pa. Immediately prior to August 7, 1968, all of the 300 outstanding shares of CHI common stock, par value $10 per share,

---

period beginning January 1, 1968 and ending with the date its existence terminated. * * *"

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise indicated.

were equally owned by William R. Cole, William F. Aull, and Richard C. Nolte.

Sometime in mid-1967, petitioner was approached by real estate brokers about the possibility of purchasing, as an investment for the trust, the dormitory properties owned by CHI. Thereafter petitioner's counsel, Philip Baskin[3] of the law firm of Baskin, Boreman, Wilner, Sachs, Gondelman & Craig (hereinafter referred to as the Baskin-Boreman firm), in conjunction with petitioner's real estate advisers, began negotiations with the brokers for the acquisition by petitioner of the dormitories, land, and fixtures relating thereto.[4] During the course of the negotiations, at least six draft sale agreements were prepared in the offices of Baskin-Boreman, all of which provided for a sale by CHI to petitioner of the aforementioned dormitory properties for a consideration of approximately $470,000 plus assumption by petitioner of mortgages slightly in excess of $1.5 million. Two of the draft agreements, both dated in April 1968, contemplate a closing as of September 29, 1968; four later drafts indicate a closing date of September 30, 1968.

At some point in mid-June of 1968, Cole, Aull, and Nolte, after consulting their attorney, indicated their unwillingness to proceed with the asset sale and instead requested that the transaction be effected as a sale of their CHI stock to petitioner. This proposed change in the form of the transaction was reflected as follows in the minutes of the meeting of petitioner's board of trustees held on July 8, 1968:

> Counsel also reported on revisions in the proposed dormitory investment at Indiana State Teachers College. It was suggested that the Trust approve the purchase of stock in lieu of assets for the purpose of reducing costs by approximately $30,000.[5] It was suggested that the Sellers were willing to

---

[3] While it is not entirely clear from the record, it appears that Seymour Baskin, a brother of Philip Baskin, was chief executive officer of petitioner in 1968 and was also a partner in the Baskin-Boreman firm until the end of 1968. However, in 1972 Philip Baskin was the chief executive officer of petitioner and was also a partner in the law firm.

[4] Since these items apparently constituted the principal, if not sole, fixed assets of CHI, we shall collectively refer to the dormitories, land, fixtures, etc., which were the subject of the transaction at issue, as the dormitory properties or the CHI assets.

[5] This figure reflects the Pennsylvania transfer tax on real estate which the parties to the transaction believed would result from a direct sale of the dormitory properties. More specifically, the parties herein have stipulated that had CHI sold its real property directly to petitioner, real estate transfer tax in the approximate

provide a $30,000 escrow, as well as a personal guarantee and indemnity agreement, to secure any claims or liabilities against the corporation which would affect stock ownership; that the security would be reduced after certain periods of time and ultimately be released after three (3) years. In view of the various assurances being received, including the indemnity and security, which indemnity would continue beyond the release of the security, and the savings which would accrue, it was recommended that the Trust approve the purchase of stock in this transaction.

After discussion, and upon motion by Mr. Cashion, seconded by Mr. Peters, it was unanimously agreed that a stock purchase be consummated as outlined and that the officers of the Trust be and hereby are authorized to execute such agreements as recommended by counsel; further, that counsel be directed to obtain personal financial statements from the proposed indemnitors as a matter of record.

On August 7, 1968, Cole, Aull, and Nolte, as sellers, entered into a stock purchase agreement with petitioner, as buyer, which agreement provided in pertinent part:

1. Sellers shall sell and transfer to Buyer, and Buyer shall purchase all of the issued and outstanding stock of College Housing, Inc. (Housing), a Pennsylvania corporation, * * * consisting of 300 shares of common stock with a par value of $10.00 per share and 100 shares of Treasury stock which had been issued previously and repurchased by Housing.

2. The purchase price shall be $460,000.00, of which $20,000.00 shall be paid upon the execution of this Agreement, which will be held in escrow by C. E. Koch and William Behrend, brokers, until closing. * * * The balance of $440,000.00 shall be paid in cash or certified check at time of closing, subject to increase or decrease resulting from prorations and adjustments hereinafter provided.

3. Closing shall commence at 10:00 A. M., D.S.T., on September 30, 1968, at the offices of Baskin, Boreman, Sachs, Gondelman & Craig, 1018 Frick Building, Pittsburgh, Pennsylvania, or at Buyer's option, at the office of a title company in Pittsburgh.

4. Sellers warrant and represent the following to Buyer:
* * *

(c) Housing is a corporation duly organized and validly existing under the laws of the Commonwealth of Pennsylvania, has corporate power to carry on its business as it is now being conducted, and is not carrying on business in any other jurisdiction of such a nature that would necessitate it to qualify to do business. At time of closing, shareholders shall deliver to Buyer the minute books of Housing, its Articles of Incorporation and all amendments thereto, its By-laws, with amendments, its corporate seal and stock transfer books and records, and all of its books and records, including tax returns.
* * *

---

amount of $39,722.68 would have been payable by the transferor, CHI, to the Commonwealth of Pennsylvania and to the municipality wherein CHI's real property was located.

(e) To the best of Sellers' information and belief, Housing has duly filed all reports and returns required by any law or regulation of the Commonwealth of Pennsylvania, or of the United States, or by any other governmental body having jurisdiction. To the best of Sellers' information and belief, as of the closing date, Housing has or will have paid or will have accrued on its books of account all taxes of every nature owed by it or shown on any such report or return to be due or assessed against it, together with all applicable interest and penalties and to the best of Sellers' information and belief, the assessment of any material amount of any additional taxes in excess of that accrued reported or paid for the period prior to the closing date is not reasonable [sic] expected.

\* \* \*

(g) In the event any actions are required of Sellers, subsequent to closing, to execute the provisions of this agreement, whether additional minutes, tax returns or any instruments or documents required of the corporation or of Sellers as shareholders and/or officers, Sellers will cause same to be prepared, executed and delivered, upon request of the Buyer. This provision shall be limited to any matter or event occurring prior to the date of closing. Sellers will cooperate with Buyer in Buyer's anticipated liquidation and dissolution of Housing.

\* \* \*

12. At closing, all pro-rations in connection with the property in Exhibit "A" hereof will be calculated as of the end of September 30, 1968 as though the properties themselves were being sold and proper deductions or additions made to the purchase price set forth in paragraph "2" hereof. Real estate taxes and rents shall be pro-rated. All interest due through September 30, 1968, on the mortgages in Exhibit "B" shall be paid or caused to be paid by Sellers. All rents due through September 30, 1968, shall belong to Sellers, and all expenses, including those not yet billed, incurred prior to October 1, 1968, shall be the obligation of Sellers. Any rents prepaid for any time beyond September 30, 1968, shall be credited to Buyer. \* \* \*

\* \* \*

20. Sellers shall submit to Buyer, on or before closing, the written resignations of each officer and director of Housing, effective as of the closing, and shall submit to Buyer at closing a general release of all claims against Housing from each officer, director and stockholder.

\* \* \*

25. The obligations of the Buyer under this agreement are conditioned upon the Buyer securing such assurances as it deems adequate from the Internal Revenue Service that the Buyer may dissolve Housing and transfer the properties of Housing to Buyer without the loss to Buyer of its exempt status as a real estate investment trust under the Internal Revenue Code, and without imposition of any tax on Buyer as a result of such dissolution and transfer. In the event the Buyer does not advise the Sellers in writing by September 6, 1968, that it is unable to secure assurances as aforesaid, then this condition shall be conclusively presumed to have been satisfied as of September 6, 1968.

\* \* \*

34. This agreement contains the entire agreement between the parties and their respective counsel, no modification of it will be valid or binding unless the same is in writing and signed by the parties thereto.

The stock purchase agreement was executed on behalf of petitioner by Seymour Baskin as chairman of the board of trustees of petitioner. Seymour Baskin was then also a senior partner in the Baskin-Boreman firm. Effective December 31, 1968, Seymour Baskin terminated his relationship with the Baskin-Boreman firm and has not since been a partner of the firm.

On August 8, 1968, petitioner submitted to the Commissioner of Internal Revenue a request for certain rulings with respect to the continuing status of petitioner as a real estate investment trust. This request provided in part:

Dear Sirs:

Your Ruling is respectfully requested as to the federal income tax consequences of the acquisition by Pittsburgh Realty Investment Trust, of all of the outstanding stock of College Housing, Inc., to be immediately followed by the liquidation of College Housing, Inc. pursuant to Section 332 of the Internal Revenue Code of 1954, as amended.

BUSINESS PURPOSE OF STOCK ACQUISITION AND LIQUIDATION

1. PRIT has attempted to acquire the five parcels of real estate in Indiana County, Pennsylvania, now owned by CHI, with the intention of holding such property as an investment, but CHI refuses to sell the same. The Shareholders of CHI, however, have indicated a willingness to sell all of the outstanding stock of CHI upon terms and conditions acceptable to PRIT.

2. Pursuant to Section 856(c)(5)(B) of the Internal Revenue Code of 1954, as amended, at the close of each quarter of the taxable year a real estate investment trust may not have more than twenty-five (25%) percent of the value of its total assets represented by securities; and in respect of any one issuer, the amount of securities may not be greater than five (5%) percent of the value of the total assets of the trust, nor greater than ten (10%) percent of the outstanding voting securities of such issuer.

3. Since ownership of the stock of CHI by PRIT would violate the provisions of Section 856(c)(5)(B) aforesaid (assuming that such stock were owned at the close of any quarter) PRIT proposes to liquidate CHI pursuant to the provisions of Section 332(a) of the Internal Revenue Code of 1954, as amended, after the closing date of September 30, 1968, but prior to November 30, 1968, which is the close of the next succeeding quarter following the acquisition.

4. PRIT intends to continue the business of CHI, i.e. of owning the dormitories in Indiana County, Pennsylvania as rental property.

5. PRIT and the shareholders of CHI have entered into a Stock Purchase Agreement, which agreement is subject to a favorable ruling from the Commissioner of Internal Revenue. * * *

## REQUEST

Based on the foregoing, a Ruling is respectfully requested to the effect that:

1. The acquisition by PRIT, after August 31, 1968, of all of the outstanding stock of CHI and the liquidation of CHI, prior to November 30, 1968, will not adversely affect the status of PRIT as a real estate investment trust pursuant to Section 856 of the Internal Revenue Code of 1954, as amended.

2. The liquidation of CHI by PRIT is approved pursuant to Section 332 of the Internal Revenue Code of 1954, as amended, and such liquidation will not give rise to the recognition of taxable gain or deductible loss.

On August 26, 1968, petitioner submitted additional information to the Commissioner by a letter amending that of August 8, 1968, and which contained the following request:

## REQUEST

A ruling is respectfully requested to the effect that:

1. The acquisition by PRIT, after August 31, 1968, of all of the outstanding stock of CHI and the liquidation of CHI, prior to November 30, 1968, will not adversely affect the status of PRIT as a real estate investment trust pursuant to Section 856 of the Internal Revenue Code of 1954, as amended.

2. The liquidation of CHI by PRIT is approved pursuant to Section 332 of the Internal Revenue Code of 1954, as amended.

3. Pursuant to Section 332(a) of the Internal Revenue Code of 1954, as amended, no gain or loss will result to the parent PRIT on the acquisition of the CHI's assets.

4. Pursuant to Section 336 of the Internal Revenue Code of 1954, as amended, no gain or loss will result to the subsidiary, CHI, on the disposition of its assets in complete liquidation.

5. Pursuant to Section 334(b)(2) of the Internal Revenue Code of 1954, as amended, the Internal Revenue Code of 1954, as amended, the basis of the assets in the hands of PRIT will be equal to its adjusted basis of the stock of CHI.

6. Pursuant to Section 1223(2) of the Internal Revenue Code of 1954, as amended, the holding period of the assets in the hands of PRIT will be tacked on to the holding period in the hands of CHI.

Both letters in respect of the ruling request were signed by Charles E. Wittlin, a member of the Baskin-Boreman firm, who, as indicated by the Power of Attorney (Form 2848) dated August 26, 1968, was authorized to represent petitioner in respect of the aforementioned ruling requests. Sometime after August 8, 1968, and prior to August 26, 1968, Wittlin traveled to Washington, D.C., to discuss petitioner's ruling request with staff of the Internal Revenue Service, attempting

thereby to expedite action in respect thereof. On the basis of this informal conference with the Internal Revenue Service, Wittlin believed that petitioner would receive a favorable ruling. On October 23, 1968, the Internal Revenue Service issued a letter ruling which held as follows:

(1) If PRIT meets the other requirements of the Code for qualification as a real estate investment trust, the acquisition by PRIT, after August 31, 1968, of all of the CHI Common and the liquidation of CHI, prior to November 30, 1968, will not adversely affect the status of PRIT as a real estate investment trust under section 856(c)(5)(B) of the Code.

(2) Pursuant to section 332(a) of the Code, no gain or loss will be recognized to PRIT upon the receipt of the property of CHI in consummation of the proposed complete liquidation, provided that all the requirements of section 332(b) are met.

(3) Pursuant to section 336 of the Code, no gain or loss will be recognized to CHI upon the distribution of its property to PRIT (except as provided in sections 47, 453(d), 1245 and 1250 of the Code).

(4) Pursuant to section 334(b)(2), the basis of the property of CHI received by PRIT will be the adjusted basis of the shares of CHI Common with respect to which the distribution is made.

The sale by Cole, Aull, and Nolte of their CHI stock to petitioner was closed, pursuant to their agreement of August 7, 1968, at a meeting on October 4, 1968. At the closing the individual sellers and petitioner executed a settlement sheet, which document was dated "10–4–68 (as of 9–30–68)." Cole, Aull, and Nolte turned over their respective stock certificates to petitioner as well as the financial books and records of CHI. Cole, Aull, and Nolte acknowledged that they would execute all tax returns for CHI for the period from January 1, 1968, through September 30, 1968.

Petitioner, acting through its agent G. L. Marhoefer Realty, assumed management control of the dormitory properties as of October 1, 1968. G. L. Marhoefer Realty maintained no books and records on behalf of CHI. By letters dated October 4, 1968, petitioner informed two of the financial institutions holding mortgages on the CHI real estate as follows:

In accordance with the information given to you previously, all of the issued and outstanding stock of College Housing, Inc. has been transferred to Pittsburgh Realty Investment Trust, which, in turn, is liquidating and dissolving the corporation and transferring the real estate owned by the corporation to the Trust.

* * *

All further inquiries on this mortgage should be directed to G.L. Marhoefer Realty, * * *

By letter dated October 4, 1968, CHI (by Cole, Aull, and Nolte) and petitioner (by Seymour Baskin, chairman) similarly notified the business manager of Indiana University of Pennsylvania that "the stock of College Housing, Inc. has this day been sold and transferred from the prior undersigned owners to Pittsburgh Realty Investment Trust."

The deed evidencing the transfer from CHI to petitioner of all of the real estate owned by CHI was dated September 30, 1968,[6] and specified thereon that "This Deed Is Being Recorded Pursuant to a Plan of Liquidation of College Housing, Inc. to the Shareholder of Said Corporation." The deed was recorded at the office of the recorder of deeds in Indiana County, Pa., on October 23, 1968.

On or about October 18, 1968, Charles E. Wittlin designated as Secretary of CHI, submitted to the District Director of Internal Revenue at Pittsburgh, Pa., an information return (Form 966) in respect of the liquidation of CHI, which return was accompanied by the following document:

### CERTIFIED COPY OF RESOLUTION

I HEREBY CERTIFY that the following is a true and correct copy of a Resolution duly adopted at a Special Joint Meeting of Shareholders and Directors of COLLEGE HOUSING, INC., duly held on the 30th day of September, 1968:

RESOLVED, that the directors, officers and counsel for the corporation be authorized and directed to take the following steps to effect complete liquidation and dissolution of the corporation, as promptly as possible, under the provisions of Section 331(a) of the Internal Revenue Code of 1954:

1. Within thirty (30) days after the date of this meeting, counsel for the corporation shall file Form 966 with the District Director of Internal Revenue, Pittsburgh, Pennsylvania, together with a certified copy of this resolution.

2. The corporation, by its duly authorized officers and directors, shall distribute all assets, subject to any unpaid liabilities, to the shareholders in redemption and cancellation of all the outstanding capital stock of the corporation.

3. As soon as possible after the distribution has been made, counsel for the corporation shall file a petition for dissolution of the corporation, pursuant to the Business Corporation Law of the Commonwealth of

---

[6] The deed was signed by Robert G. Sable as president of CHI and attested by Charles E. Wittlin as secretary of CHI. At the time Sable was an employee of the Baskin-Boreman firm.

Pennsylvania, and the officers of the corporation are authorized to execute all documents necessary in connection with said dissolution.

4. The officers and directors of the corporation are empowered, authorized and directed to carry out the provisions of this resolution and to adopt any further resolutions that may be found necessary in liquidating and dissolving the corporation in accordance with the express intent of the shareholders and directors under the Plan adopted at this meeting. Dated, October 15, 1968.

(S) Charles E. Wittlin

CHARLES E. WITTLIN, *Secretary*

No meeting of the shareholders and directors of College Housing, Inc., was actually held on September 30, 1968.

On October 21, 1968, a certificate of election to dissolve was filed on behalf of CHI by Sable, as president, with the Commonwealth of Pennsylvania Department of State. A certificate of dissolution was ultimately issued by the secretary of the Commonwealth of Pennsylvania on February 17, 1971.

A U.S. Corporation Income Tax Return (Form 1120) captioned "Final Return—9 Months" was filed for CHI for the period January 1, 1968, to September 30, 1968. In addition to the signature of the preparer thereof, the return bears the signature of Richard C. Nolte as "Secy" dated December 15, 1968. The return was stamped by the Office of the District Director of Internal Revenue at Pittsburgh, Pa., as received on December 17, 1968. The amount of gross income stated in the return of CHI for the period January 1, 1968, through September 30, 1968, was $189,858.30 which was comprised of rent of $186,932.53 and vending machine income of $2,925.77.

An amended return for CHI was filed for the period January 1, 1968, to September 30, 1968. This return, captioned "Amended" and "Final Return—9 Months," was signed by the preparer and by Richard C. Nolte as "Sec." dated March 18, 1969, and received by the Internal Revenue Service Center at Philadelphia, Pa., on March 19, 1969. The amended return differs from the original return filed for CHI only in that the Schedule L balance sheet for the amended return indicates the amounts of assets, liabilities, and stockholders' equity for the end of the taxable year whereas the original return omitted these figures and stated in place thereof "Dissolved 9/30/68."

During the taxable period for 1968, CHI had gains on the disposition of property in the total amount of $105,870.97 which figure is comprised of gain on the disposition of depreciable property in the amount of $26,496.16 taxable as ordinary income under section 1245 and gain on the disposition of depreciable real property of $79,374.81 taxable as ordinary income under section 1250. None of these gains was included in the gross income stated in either the original return or the amended return of CHI filed for the period January 1, 1968, to September 30, 1968. The parties agree that the gain of $105,870.97, to which the deficiency determined by respondent is attributable, was properly includable in the gross income of CHI for the period beginning January 1, 1968, and ending on the date in 1968 that we determine ends the taxable period.[7] Said gain of $105,870.97 is in excess of 25 percent of the gross income of CHI stated in the income tax return (original and as amended) that it filed for the period indicated thereon as January 1, 1968, to September 30, 1968. The original return for the period January through September 1968 and the amended return for that period both contained depreciation schedules showing that the double declining balance method was used to compute depreciation on buildings in said period and that the straight-line method was used to compute depreciation on furniture and fixtures in said period.

Respondent mailed the notice of liability in docket No. 1786–73 by certified mail on December 15, 1972. Said notice was addressed to Pittsburgh Realty Investment Trust at 1018 Frick Building, Pittsburgh, Pa. 15219. As of December 15, 1972, petitioner was located at 1312 Frick Building, and this notice of liability was not actually received by petitioner in its office at 1312 Frick Building until December 20, 1972.[8] The 1018 Frick Building address, to which the notice of liability was sent and which was in fact the address of the Baskin-Boreman firm, was based on the address of petitioner indicated in the report submitted by the revenue agent who conducted the audit in respect of CHI's tax liability for the

---

[7] See n. 1 supra.

[8] The record does not reveal how it was delivered or who signed on behalf of petitioner for the certified mailing.

period in issue. In the course of the audit, the revenue agent in May 1972 telephoned Philip Baskin, then chairman of petitioner's board of trustees and also a senior partner in the Baskin-Boreman firm, who referred the agent to Wittlin. On at least three occasions thereafter, the agent went to 1018 Frick Building where he met with Wittlin whom the agent believed had been an officer of CHI. At none of these meetings did the revenue agent inquire of Wittlin as to the capacity in which he was acting. In determining that 1018 Frick Building was petitioner's address, the agent did not refer to the income tax returns previously filed by petitioner, which returns indicated the petitioner's address as follows:

| Return for FYE Nov. 30— | Address shown |
|---|---|
| [9]1968 | 1008 Frick Bldg. |
| 1969 | 604 Frick Bldg. |
| 1971 | 1312 Frick Bldg. |

Respondent issued the notice of liability to petitioner in docket No. 9887–74 by certified mail on October 3, 1974. This notice was addressed to petitioner at 1312 Frick Building, Pittsburgh, Pa. 15219.

## OPINION

The primary issue presented herein is whether petitioner is a transferee of CHI within the meaning of section 6901,[10]

---

[9] The aforementioned deed evidencing the transfer by CHI of its real property to petitioner states that "the precise residence of the grantee herein [petitioner] is 1019 Frick Building, Pittsburgh, Pa. 15219."

[10] In general, sec. 6901 provides:

SEC. 6901. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) INCOME, ESTATE, AND GIFT TAXES. —

(A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

* * *

(h) DEFINITION OF TRANSFEREE.—As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under section 6324(a)(2), is personally liable for any part of such tax.

determination of which status depends on whether petitioner's purchase of all of the outstanding stock of CHI and the subsequent liquidation of CHI are to be accorded independent significance such that petitioner is liable as a transferee within the ambit of section 6901 or whether, as petitioner contends, the substance of the transaction, being that of an asset sale, warrants characterization of petitioner as a purchaser of assets and as such, not a transferee under section 6901. There is no dispute as to the underlying deficiency of $38,189.48 due from CHI or that by virtue of the liquidation of CHI, petitioner received assets of value in excess of the deficiency asserted and CHI was rendered insolvent thereby.

If we find that petitioner is a transferee within the purview of section 6901, we must decide whether assessment of the transferee liability against petitioner is barred by the statute of limitations; specifically, we must ascertain to what taxable period the deficiency in income tax of CHI properly relates in order to further determine which notice of liability, that issued by respondent in docket No. 1786–73 in respect of CHI's taxable year January 1, 1968, to September 30, 1968, or that issued by respondent in docket No. 9887–74 for a taxable period ending after September 30, 1968, but prior to December 31, 1968, is the operative notice of liability whose timeliness is in issue. Resolution of the question as to the close of CHI's taxable year in turn depends on when the liquidation of CHI occurred.

Turning to the issue of petitioner's status as a transferee, we note at the outset that both petitioner and respondent agree that the instant transaction was, as a matter of form, a purchase by petitioner of the stock of CHI followed by the liquidation of CHI. Petitioner contends, however, that the transaction, viewed in its entirety, was in substance a purchase of assets which really should be given effect herein so that petitioner, as a purchaser, is not a transferee for purposes of section 6901. Petitioner invokes the familiar doctrine of substance over form, see e.g., *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951), cert. denied 342 U.S. 827 (1951), and urges that substance, i.e., characterization of the transaction as an asset

sale, should herein prevail. We disagree; the transaction in controversy warrants no such procrustean restructuring as would in this instance result from application of that doctrine.

There can be no question on the evidence presented that petitioner's primary objective was to acquire the dormitory properties from CHI and that those assets were all it was interested in acquiring. But there can likewise be no question that the owners of CHI decided before agreement was reached that CHI would not sell the assets but that they were willing to sell their stock to petitioner. They had legal advice and sound reasons for so concluding. And there can be no question that petitioner agreed to buy the stock instead of the assets. The agreement of sale was between petitioner and the stockholders, not petitioner and CHI. The terms of the contract were clear and unambiguous, and petitioner's attorneys, in drafting the agreement, went to considerable length to protect petitioner under this form of transaction by requiring the stockholders to place funds in escrow and otherwise guarantee petitioner against known liabilities. Furthermore, the transaction was carried out as a purchase of stock and all parties considered it as such until the tax liability arose. The question is, under such circumstances, may petitioner successfully argue that what it considered to be the substance of the transaction should prevail over the form thereof undertaken at the seller's insistence with the result that the burden of the transferee liability would be shifted from petitioner to the selling stockholders of CHI.

As a threshold matter, petitioner's attempt to recharacterize the instant transaction is precluded by the rule established by the Court of Appeals for the Third Circuit, wherein appeal from our decision in this case would lie (see *Jack E. Golsen,* 54 T.C. 742 (1970)), in *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), wherein the court adopted the following rule:

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [378 F.2d at 775.]

Here petitioner has established none of the above-specified circumstances warranting exception to the rule. We do not regard petitioner's belated argument that there was a *mistake* because neither party recognized that liquidation of CHI would trigger the recapture tax as qualifying as an exception to the rule. See *Hamlin's Trust v. Commissioner,* 209 F.2d 761 (10th Cir. 1954); *Norris v. Crowe,* 206 Pa. 438, 55 A. 1125 (1903). But even if we were to apply the "strong proof" rule of *Ullman v. Commissioner,* 264 F.2d 305 (2d Cir. 1959), which this Court has used most frequently in the past, we could not uphold petitioner's right to reform the agreement as made. Petitioner, with the advice of counsel, agreed to purchase the stock, and there was no misunderstanding as to what was being purchased. While petitioner was primarily interested in acquiring the real estate, once it had acquired the stock there was nothing that would have prevented it from reselling the stock to a third party at a profit rather than liquidating CHI.

Petitioner argues that the *Danielson* rule is applicable only where there is an attack on a contractual allocation of part of the purchase price to a covenant not to compete. We disagree. But even were we, arguendo, to accept the narrower view of the scope of the rule in *Commissioner v. Danielson, supra,* as reflected by petitioner's attempt to distinguish the *Danielson* situation from that herein, we are unpersuaded by petitioner's argument on the merits. Although we recognize that, as evidenced by the preliminary negotiations and the ruling requests submitted on behalf of petitioner, petitioner's overall intent was to acquire the CHI dormitory properties, we do not believe it necessarily follows that the actual manner in which the parties chose to effectuate petitioner's ultimate acquisition of those assets is not to be accorded independent significance. Petitioner's trustees became well aware of the steps that would have to be taken if petitioner was to acquire the properties and there is nothing to indicate that they did not have a clear understanding of the substance and content of the agreement. See *Hamlin's Trust v. Commissioner, supra.* Indeed, in view of their awareness of the consequences in terms of the Pennsylvania transfer tax liability and petitioner's status as a qualified real estate investment trust, the parties to the transaction did not themselves consider the form of the transaction to be without substantive import.

Thus, we find no conflict between form and substance upon which dichotomy petitioner predicates application of the substance-over-form doctrine. Cf. *Meyer Mittleman*, 56 T.C. 171, 175 (1971), affd. per curiam 464 F.2d 1393 (3d Cir. 1972).

Further, we believe petitioner's reliance on the step-transaction principle of *Kimbell-Diamond Milling Co., supra,* is inappropriate and without merit in the instant context. While under *Kimbell-Diamond* or section 334(b)(2), its statutory counterpart, petitioner's purchase of the CHI stock and subsequent liquidation of CHI may be considered a purchase of CHI's assets, neither authority warrants recharacterization of the transaction for other than basis purposes. Quite simply, the fact that the transaction may be viewed in the basis context as a single-step asset purchase in no way vitiates the transfer element for purposes of section 6901. As we noted in *Cabax Mills*, 59 T.C. 401 (1972), involving the holding period of assets acquired by the taxpayer in a transaction which we held to qualify under section 334(b)(2) and wherein we rejected respondent's argument that by virtue of the application of section 334(b)(2) there could be no liquidation, hence no exchange as required by section 1223(1):

the section 334(b)(2) exception does not dispense with the fact that a liquidation has taken place. * * * we think that respondent reads too much into the holdings of the cases he cites. Those cases [the *Kimbell-Diamond* line of cases] address only the problem of what basis attaches to assets received in a liquidation under special circumstances. * * * [Citations omitted; 59 T.C. at 409.]

Similarly, the constituent steps of the purchase of the CHI stock and the subsequent liquidation of CHI retain their integrity herein, thus establishing petitioner's liability as a transferee within the ambit of section 6901.

Citing *American Potash & Chemical Corp. v. United States,* 399 F.2d 194 (Ct. Cl. 1968), and *Commissioner v. Ashland Oil & R. Co.,* 99 F.2d 588 (6th Cir. 1938), in support of its substance-over-form argument, petitioner contends that the rule must be applied whether the form of the agreement is being attacked by one of the parties thereto or by the Commissioner, relying on *Hoffman Motors Corp. v. United States,* 473 F.2d 254 (2d Cir. 1973), and *Carrington v. Commissioner,* 476 F.2d 704 (5th Cir. 1973). The latter two cases are inapposite. In *Carrington,* the *respondent* unsuccess-

fully sought to recast the form of a gift transaction to treat it as a dividend to the donor-stockholder. *Hoffman* involved excise taxes; however, the court did say: "In no case that we have found has a taxpayer been permitted to benefit from substance over form if his motives were predominantly tax avoidance."

We recognize that the substance-form rubric has been successfully used by the Commissioner in attacking the form of transactions under circumstances similar to those here, but where the purpose of casting the form was to avoid taxes. But this does not mean that a party to an agreement may recast his agreement with a third party in order to avoid tax liability asserted against him by the Commissioner in reliance on the terms of the agreement entered into by the parties. The reason for this is stated in *Commissioner v. Danielson, supra,* to be:

Where the Commissioner attacks the formal agreement the Court involved is required to examine the "substance" and not merely the "form" of the transaction. This is so for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 576 (1935); C.I.R. v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In contrast, the Commissioner here is attempting to hold a party to his agreement unless that party can show in effect that it is not truly the agreement of the parties. And to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make. [378 F.2d at 774-775.]

The case before us presents an excellent example of the reason for such a rule. Petitioner seeks to avoid liability as a transferee by claiming that in substance it bought assets from CHI. Were the respondent to assert transferee liability against the selling stockholders of CHI they could very justifiably claim that they in fact sold their stock in CHI according to the terms of the contract and had nothing to do with the liquidation of CHI, which in fact they did not. The Government would be left on the horns of a dilemma and the best solution is to hold the parties to the terms of their agreement as evidenced by the stock purchase agreement.

Having determined petitioner's status as a transferee, we now reach the question of whether assessment of the deficiency is barred by the statute of limitations.[11] Resolution of this question requires us to determine when the liquidation of CHI occurred thereby ending the taxable period of CHI which began January 1, 1968, so that we can in turn ascertain which of the two notices of liability issued to petitioner is the one whose timeliness is in issue. Relying on September 30, 1968, as the close of CHI's final taxable year, petitioner argues as follows: The notice of liability issued to petitioner in docket No. 1786-73 is the notice upon which assessment of the deficiency against petitioner depends; that notice was ineffective to toll the statute of limitations since it was not mailed to petitioner at its last known address as required by section 6901(g)[12] and was received by petitioner after the statute had run; therefore, assessment of the deficiency against petitioner is barred by the statute of limitations. Respondent's primary position is that CHI was not liquidated on or before September 30, 1968, such that CHI's taxable year beginning January 1, 1968, did not close on September 30, 1968, but sometime thereafter, for which longer taxable period no return was filed on behalf of CHI. Absent a return for CHI's correct taxable period, respondent argues that the notice of liability relative thereto in docket No. 9887-74 was timely issued under section 6501(c)(3)[13] and accordingly concludes

---

[11] In pertinent part, sec. 6901(c) provides:

(c) PERIOD OF LIMITATIONS.—The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows:

(1) INITIAL TRANSFEREE.—In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;

By its terms, sec. 6901(c)(1) directs our inquiry to the period of limitations applicable to CHI, petitioner's transferor.

[12] Sec. 6901(g) provides:

(g) ADDRESS FOR NOTICE OF LIABILITY.—In the absence of notice to the Secretary or his delegate under section 6903 of the existence of a fiduciary relationship, any notice of liability enforceable under this section required to be mailed to such person, shall, if mailed to the person subject to the liability at his last known address, be sufficient for purposes of this title, even if such person is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

[13] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the

that assessment of the deficiency herein is not barred by the statute of limitations. Alternatively, respondent argues that if we determine that CHI's taxable year ended September 30, 1968, so that the return was filed for the correct period, then the notice of liability relative to docket No. 1786–73 met the mailing requirements of section 6901(g) and, being timely mailed, suspended the running of the statute of limitations.

We agree with respondent's arguments on both alternatives and were it not for the fact that a decision will have to be entered in one or the other docket number, we would decide the issue for respondent without having to decide which argument is best. But such is the situation so we have decided the case on the theory we think is strongest.

Pursuant to sections 6012(a)(2) and 443(a)(2),[14] CHI was required to file a return for that portion of its taxable year beginning January 1, 1968, during which it was in existence, as to which status the regulations under section 1.6012–2(a)(2), Income Tax Regs., provide as follows:

(2) *Existence of corporation.* A corporation in existence during any portion of a taxable year is required to make a return. If a corporation was not in existence throughout an annual accounting period (either calendar year or fiscal year), the corporation is required to make a return for that fractional part of a year during which it was in existence. A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing

---

expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

* * *

(c) EXCEPTIONS.—

· * * *

(3) No RETURN.—In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

[14] SEC. 6012. PERSONS REQUIRED TO MAKE RETURNS OF INCOME.

(a) GENERAL RULE.—Returns with respect to income taxes under subtitle A shall be made by the following:

* * *

(2) Every corporation subject to taxation under subtitle A;

SEC. 443. RETURNS FOR A PERIOD OF LESS THAN 12 MONTHS.

(a) RETURNS FOR SHORT PERIOD.—A return for a period of less than 12 months (referred to in this section as "short period") shall be made under any of the following circumstances:

* * *

(2) TAXPAYER NOT IN EXISTENCE FOR ENTIRE TAXABLE YEAR.—When the taxpayer is in existence during only part of what would otherwise be his taxable year.

as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets and therefore continues in existence. A corporation does not go out of existence if it is turned over to receivers or trustees who continue to operate it. * * *

Although the regulations refer to dissolution, both petitioner and respondent herein have proceeded on the understanding that the complete liquidation of CHI constitutes a de facto dissolution of CHI which terminated its existence. See Rev. Rul. 71–129, 1971–1 C.B. 397.

The determination as to whether and/or when a corporation has liquidated is a question of fact, *Transportation Service Associates, Inc. v. Commissioner,* 149 F.2d 354 (3d Cir. 1945); *Kennemer v. Commissioner,* 96 F.2d 177 (5th Cir. 1938), affg. 35 B.T.A. 415 (1937). Proof of a distribution in complete liquidation not only depends on an intent to liquidate but also requires acts which demonstrate and effect that intent. *Kennemer v. Commissioner, supra* at 178; *Genecov v. United States,* 412 F.2d 556, 561–562 (5th Cir. 1969); *Hageman v. Commissioner,* 446 F.2d 20 (5th Cir. 1971), affg. a Memorandum Opinion of this Court; *Gensinger v. Commissioner,* 208 F.2d 576, 583 (9th Cir. 1953), remanding 18 T.C. 122 (1952). Although petitioner may have intended to accomplish the liquidation of CHI on September 30, 1968 (which is not at all clear from the evidence), we are not persuaded that CHI was in fact liquidated on that date.

For one, we emphasize that petitioner could not liquidate CHI prior to having acquired the stock of CHI, yet as petitioner admits, the stock sale was not in fact closed until October 4, 1968. In light of that fact, we can accord little weight or operative significance to the various documents— the closing sheet, the Form 966, the deed to petitioner, and the papers filed with the Commonwealth relative to the dissolution of CHI—which purport to place the stock sale and liquidation on September 30, 1968. In a business context, where both parties to a transaction are agreed, the custom of backdating documents or dating them "as of" a prior date may be acceptable. But in the present context where the liquidation itself triggers the recapture taxes and may determine who is liable for the tax, the actual date of liquidation must be determined and we cannot accept

predating of events which have a bearing on when the liquidation was accomplished.

Moreover, even were we to accept the premise that the stock sale closing was effective "as of" September 30, 1968, as indicated on the closing sheet referred to in our findings, *supra,* it does not necessarily follow therefrom that the liquidation of CHI also transpired "as of" September 30, 1968. The fact that petitioner intended its stock acquisition "to be immediately followed" by the liquidation of CHI, as stated in petitioner's ruling request, or that the liquidation was to be effected "as promptly as possible," as indicated by the resolution accompanying Form 966, does not suffice to establish September 30, 1968, as the date of liquidation.

While the deed from CHI conveying its real property to petitioner, as shareholder, does provide some support for September 30, 1968, as the date of liquidation, this document alone fails to prove that as of September 30, 1968, CHI had effected a complete distribution of its assets. Indeed, petitioner's own actions suggest that petitioner did not consider CHI to be completely liquidated as of September 30, 1968. As evidenced by the letters dated October 4, 1968, *supra,* to two of the mortgageholders, petitioner stated that it "*is* liquidating and dissolving the corporation [CHI] and transferring the real estate owned by the corporation to [petitioner]." (Emphasis added.) Similarly, in its letter of October 4, 1968, petitioner apprised the business manager of Indiana University of Pennsylvania only of a change in ownership of CHI, not of an accomplished liquidation of CHI.

In view of the actual chronology of events herein, we conclude that CHI was not in fact completely liquidated on or before September 30, 1968, and as a consequence, CHI's taxable year beginning January 1, 1968, did not close on September 30, 1968. Thus, the return which was actually filed for CHI did not represent CHI's proper taxable year and as such does not operate as a return for purposes of the running of the statute of limitations. See *Anne Schick,* 45 T.C. 368, 373 (1966); *E.D. Gensinger,* 18 T.C. 122, 132–133 (1952), affd. on this issue 208 F.2d 576 (9th Cir. 1953). We therefore hold, pursuant to section 6501(c)(3), that since no valid return was filed for CHI's proper taxable year the notice of liability in docket No. 9887–74 was timely issued by respondent, and

assessment against petitioner of the deficiency determined therein is not barred by the statute of limitations. Given our finding that January 1, 1968, to September 30, 1968, was not CHI's entire, and therefore correct, taxable period, and since respondent has no authority to issue a notice of liability for a period less than the proper taxable period, *Columbia River Orchards, Inc.*, 15 T.C. 253 (1950); *Anne Schick, supra,* the notice of liability issued to petitioner in docket No. 1786–73 in respect of that period ending September 30, 1968, is ineffective, *Columbia River Orchards, Inc., supra,* and this Court has no jurisdiction in that docket number. *Emmet N. Shelton,* 63 T.C. 193 (1974), and cases cited therein. Compare *Sanderling, Inc.,* 66 T.C. 743 (1976), particularly n. 7 at 749–750.

For completeness we will discuss briefly respondent's alternative argument, which petitioner directly disputes. If we assume that the liquidation of CHI can be considered to have occurred on September 30, then the returns filed for CHI for the period January 1, 1968, through September 30, 1968, were valid returns for the proper taxable period. Since the original return for CHI was filed December 15, 1968, the first notice of transferee liability (involved in docket No. 1786–73) which was mailed by respondent on December 15, 1972, was timely mailed, and petitioner does not argue to the contrary. But, petitioner argues, that notice was incorrectly addressed and therefore would not toll the statute of limitations until it was actually received by petitioner on December 20, 1972, after the 4-year statute of limitations had run.

The normal period of limitations for assessment of deficiencies in income tax is 3 years after the return for the year of the deficiency is filed. Sec. 6501, I.R.C. 1954. Section 6503, in conjunction with section 6213(a), provides that the running of the period of limitations for assessment of deficiencies shall be suspended after the mailing of the notice of deficiency provided for in section 6212 until the 90 days or 150 days referred to in the notice of deficiency have passed or, if a petition is filed in the Tax Court, until the decision of the Tax Court has become final. Under these provisions the action that suspends the running of the period of limitations is the *mailing* of a notice of a deficiency within the 3-year period, or the 4-year period for transferee liability, see sec. 6901(c)(1) and (f). Thus if the first notice of transferee liability mailed to

petitioner was valid we do not believe the date it was received by petitioner is material or relevant. There have been cases involving the timely mailing of petitions in the Tax Court that have held that an incorrectly addressed notice of deficiency was valid if it was actually received by the taxpayer in time to file a timely petition in the Tax Court, see *Clement Brzezinski,* 23 T.C. 192 (1954), and a few cases that have held that under such circumstances the 90-day period for filing the petition does not start to run until the notice of deficiency is received by the taxpayer, see *Estate of Francis P. McKaig, Jr.,* 51 T.C. 331 (1968); *Arlington Corp. v. Commissioner,* 183 F.2d 448 (5th Cir. 1950), but we know of no cases where the date of delivery of the notice of deficiency or liability was considered in determining whether the statute of limitations barred assessment of the deficiency. We recognize that cross-references to cases dealing with the timely filing of petitions have been made in opinions dealing with the statute of limitations; by such analogy this notice should be valid even if it was mailed to the wrong office address because it was received by petitioner in time to file a timely petition in this Court, which it did. Nevertheless, we have given consideration to petitioner's argument that the first notice of liability was not mailed to petitioner's "last known address."

In *Daniel Lifter,* 59 T.C. 818, 821 (1973), this Court said:

In other words, for purposes of section 6212(b)(1), a taxpayer's last known address must be determined by a consideration of all relevant circumstances; it is the address which, in the light of such circumstances, the respondent reasonably believes the taxpayer wishes to have the respondent use in sending mail to him. * * *

The same definition should be applicable to the "last known address" of a transferee as used in section 6901(g). See *Commissioner v. Rosenheim,* 132 F.2d 677 (3d Cir. 1942), revg. and remanding 45 B.T.A. 1018 (1941).

The notice of transferee liability under consideration was addressed to petitioner at "1018 Frick Bldg., 450 Fifth Avenue, Pittsburgh, Pennsylvania, 15219." The building and street address were correct but petitioner claims that its "last known address" in December of 1972 was 1312 Frick Building.

Without discussing in detail the evidence upon which we rely, we have concluded that in light of the relevant circumstances the respondent was justified in believing that

1018 Frick Building was the address of petitioner or at least was the address which respondent reasonably believed the taxpayer wished him to use in sending mail to it.

PRIT's office had always been in the Frick Building. PRIT's chief executive officer in 1968, Seymour Baskin, had been a member of the Baskin-Boreman law firm which represented PRIT. His brother, Philip Baskin, was chief executive officer of PRIT in 1972 and was still a member of that firm in 1972. Baskin-Boreman occupied a suite of offices on the 10th floor of the Frick Building, of which room 1018 was a part. When the revenue agent first contacted PRIT about the transferee liability he was directed to, and on several occasions met with, an attorney in the Baskin-Boreman firm in the partnership's suite of offices. This attorney, Wittlin, requested a ruling from respondent in 1968, in behalf of PRIT, on the effect taxwise on PRIT of its acquisition of the stock of CHI. In connection with the ruling request Wittlin filed a power of attorney with respondent which gave the address of PRIT as 1016 Frick Building and his own address as 1018 Frick Building. Respondent's reply to the ruling request was addressed to 1016 Frick Building. In paragraph 18 of the stock purchase agreement between PRIT and the stockholders of CHI it was provided that all notices to PRIT should be sent to Baskin-Boreman at the Frick Building, without designation of a room number. Affixed to the deed from CHI to PRIT was a "Certificate of Residence" which stated, "I hereby certify that the precise residence of the grantee herein is 1019 Frick Building, Pittsburgh, Pa., 15219." The grantee in the deed was PRIT and the certificate was signed by Wittlin for the grantee.

PRIT was apparently somewhat of a will-of-the-wisp in the Frick Building. The address given on its tax return for fiscal year ending November 30, 1968, was 1008 Frick Building; for fiscal year ending November 30, 1969, it was 604 Frick Building; and for fiscal year ending November 30, 1971, it was 1312 Frick Building. PRIT's return for fiscal year ending November 30, 1972, had not been filed when the notice of transferee liability was issued. We surmise that at any given time its address was the particular office in the Frick Building that its chief executive officer and attorney happened to be occupying. Respondent's agent did not have PRIT's tax

returns with him during his audit and conversations with PRIT's representatives; he did have access to all of the other documents we have referred to above. The agent gave 1018 Frick Building as PRIT's address in his reports and in preparing the notice of transferee liability respondent's representative used the address given in the agent's report.

Under all the relevant circumstances we believe respondent was justified in thinking that 1018 Frick Building was the address PRIT wanted him to use in sending mail to it. We believe that the notice was probably received by PRIT on the same day that it would have been received had it been addressed to 1312 Frick Building, and that the same would be true had it been addressed to Frick Building without a room designation. The address used was the address of PRIT's attorneys, and it is inconceivable to us that the attorneys would not have delivered it to PRIT immediately had there been any necessity for doing so. While respondent's representatives might have avoided this argument had they been more careful, we conclude that the error in address was inconsequential and did not in any way prejudice PRIT. Such an error did not destroy the validity of the notice of transferee liability. Neither did it delay the effectiveness of the notice to toll the statute of limitations as of the date it was mailed. See *Floyd R. Clodfelter,* 57 T.C. 102 (1971), affd. 527 F.2d 754 (9th Cir. 1975).

Having found that the notice of transferee liability involved in docket No. 1786–73 was valid and timely mailed under section 6901(g), if the liquidation of CHI occurred on September 30, 1968, such that the returns filed by CHI were for the proper period, we would perforce conclude that the statute of limitations did not bar assessment of the transferee liability against PRIT and would enter decision for respondent in docket No. 1786–73. However, having concluded that the liquidation of CHI did not occur until after September 30, 1968, and that no return was filed for CHI for the proper period in 1968 to start the running of the statute of limitations for assessment of transferee liability for that

period, and that the second notice of transferee liability sent to petitioner was valid and timely,

> *Decision will be entered for the respondent in docket No. 9887–74.*

> *Docket No. 1786–73 will be dismissed for lack of jurisdiction.*

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise indicated.