CABAX MILLS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4426–70. Filed December 13, 1972.

*Milo E. Ormseth* and *Thomas B. Stoel,* for the petitioner.
*Lee A. Kamp,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's corporate income tax in the amount of $49,648.84 for its calendar year ended December 31, 1965. The issue presented for our decision is whether for purposes of section 631(a) of the Internal Revenue Code,[1] petitioner held certain timber-cutting contracts, which it received in a liquidation distribution, for more than 6 months prior to January 1, 1965.

FINDINGS OF FACT

The majority of the facts have been stipulated and are so found. The parties have agreed on the following statements in the stipulation.

Cabax Mills (hereinafter Cabax or petitioner) is an Oregon corporation with its principal place of business located in Eugene, Oreg. Petitioner filed its Federal corporate income tax return for its taxable year ending December 31, 1965, with the district director of internal revenue, Portland, Oreg.

During the year in question, petitioner was engaged in logging and manufacturing lumber in the State of Oregon. In the early months of 1964, petitioner became interested in acquiring Snellstrom Lumber Co. (hereinafter Snellstrom), a small closely held corporation engaged in logging and manufacturing plywood and lumber. Petitioner's interest

---

[1] All section references are to the Internal Revenue Code of 1954.

in Snellstrom was engendered primarily in a plywood plant and certain timber-cutting rights it owned. Petitioner had attempted to purchase these assets from Snellstrom but the owners did not want to strip their corporation of its principal assets. Consequently, on March 31, 1964, Cabax and representatives of the holders of 530 of the 538 outstanding shares of capital stock of Snellstrom executed a contract of sale for the stock.

Under the provisions of the sales contract, Cabax agreed to purchase, and the shareholders agreed to sell, 530 shares (or 98 percent) of the outstanding stock of Snellstrom. The sales price for the stock was $5,000 per share for a total purchase price of $2,650,000. The $5,000 price was payable on an installment basis: $1,000 at the closing; $450 at closing or within 60 days thereafter; and the balance of $3,550 in six equal installments, with each installment due on each succeeding anniversary of the closing, together with annual interest of 5 percent on the declining principal balances, beginning at the date of closing, interest to be paid with and in addition to the principal payments.

The closing of the transaction was scheduled for April 1, 1964, or a later time fixed by representatives of the sellers, but in no event later than April 9, 1964. The closing actually occurred April 3, 1964. Under the contract, the sellers were required to deliver title to and possession of the Snellstrom shares to Cabax, and Cabax was then to assume all of the benefits and burdens of the ownership of such shares. Additionally, the officers and directors of Snellstrom were required to resign and nominees of Cabax were immediately elected to assume complete management and control of the new subsidiary corporation. In return, Cabax was required to cause new certificates for the purchased shares to be issued in its name and delivered to a bank as trustee, under a pledge to provide security for the unpaid balance of the purchase price, promptly after the closing. The security arrangement included a prohibition against liquidation of Snellstrom by Cabax until 40 percent of the purchase price for the Snellstrom shares had been paid.

Following the acquisition of Snellstrom, Cabax operated it as a subsidiary for slightly more than a year. By April 1965, petitioner had satisfied the conditions precedent to Snellstrom's liquidation imposed by the March 31, 1964, sales agreement. Accordingly, Snellstrom was liquidated pursuant to a plan of liquidation dated April 13, 1965.

In the course of the liquidation, Cabax surrendered all of its stock in Snellstrom and received in exchange therefor all of the assets and assumed all of the liabilities of Snellstrom immediately prior to its liquidation. However, cash in an amount equal to the aggregate book value of the 8 shares of Snellstrom stock which Cabax had not purchased was reserved by Snellstrom for such shareholders and Cabax

did not assume the obligation of Snellstrom to the holders of the 8 shares. Among the assets which Cabax received from Snellstrom were the contract rights to cut six tracts of timber. Snellstrom had held these contract rights to cut timber for more than 6 months prior to January 1, 1965.

During the year prior to its liquidation, Snellstrom cut timber from certain tracts in which it had contractual cutting rights. Attendantly, it elected to characterize its gain or loss realized from the appropriation of said timber under the provisions of section 631(a).

Subsequent to the liquidation, during the period commencing May 1, 1965, and ending December 31, 1965, Cabax cut timber for its operations under the contract rights received in the Snellstrom liquidation. Cabax also elected to characterize its gain or loss realized from the appropriation of said timber under the provisions of section 631(a).

The purchase by Cabax of the Snellstrom stock constituted a "purchase" within the meaning of section 334(b)(3) of the Code. Following the purchase of the Snellstrom stock, Cabax continued to hold it as a capital asset until the shares were surrendered pursuant to the liquidation plan.

The liquidation of Snellstrom was a liquidation of the type described in section 334(b)(2). The basis of the property distributed to Cabax from Snellstrom, including the timber rights, was determined pursuant to the provisions of section 334(b)(2) to be $2,814,559.15.

On its return filed March 11, 1966, petitioner reported total longterm capital gains of $358,158.72. Of that figure, $302,928.39 was reported as long-term capital gain realized on the timber cut under the timber rights originally owned by Snellstrom. In the notice of deficiency respondent determined that the $302,928.39 gain did not qualify for long-term capital gains treatment under the provisions of section 631(a), because petitioner had not held the timber rights for more than 6 months prior to the beginning of its 1965 tax year as required by that section.

Prior to trial, the parties stipulated that petitioner's 1965 timbercutting operations under the auspices of the Snellstrom timber contracts will be considered as a sale or exchange of such timber as provided in section 631(a) if petitioner establishes that its holding period of the contract rights to cut such timber is deemed to have commenced before June 30, 1964.

We find from the evidence that petitioner's purpose in buying the stock of Snellstrom was to acquire the assets of Snellstrom.

OPINION

The basic facts are not in dispute. The single issue for our determination is whether petitioner can be considered under the applicable sections of the Code to have held the contract rights to cut timber, which it received on the liquidation of Snellstrom, for a period of more than 6 months before January 1, 1965. In other words, for purposes of section 631(a), will petitioner be considered to have acquired the cutting rights held by Snellstrom at the time it acquired the Snellstrom stock in April of 1964 or at the time Snellstrom was liquidated in April of 1965.

Petitioner alleges that it purchased 98 percent of the stock of Snellstrom on April 3, 1964, and that this constituted a purchase within the meaning of section 334(b)(3); that it liquidated Snellstrom on April 30, 1965, pursuant to a plan of liquidation adopted on April 13, 1965; that it received from Snellstrom contract rights to cut certain tracts of timber; and that it cut the timber during the period May 1, 1965, through December 31, 1965. Petitioner further alleges that its purchase and liquidation of Snellstrom were section 334(b)(2) transactions, that Snellstrom held the contract rights to cut timber for more than 6 months prior to January 1, 1965, and that petitioner held the stock of Snellstrom for more than 6 months prior to January 1, 1965.

On these facts, petitioner contends that under section 1223(1) its holding period for the timber is deemed to have commenced when it acquired the stock of Snellstrom, or more than 6 months prior to January 1, 1965, and that, therefore, under section 631(a)[2] its cutting of the timber should be viewed as a sale or exchange, thus entitling it to capital gains treatment on its profits derived therefrom.[3]

---

[2] SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.

(a) ELECTION TO CONSIDER CUTTING AS SALE OR EXCHANGE.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. If a taxpayer makes an election under this subsection, such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding on the taxpayer for the taxable year for which the election is made and for all subsequent years, unless the Secretary or his delegate, on showing of undue hardship, permits the taxpayer to revoke his election; such revocation, however, shall preclude any further elections under this subsection except with the consent of the Secretary or his delegate. For purposes of this subsection and subsection (b), the term "timber" includes evergreen trees which are more than 6 years old at the time severed from the roots and are sold for ornamental purposes.

[3] Because of our conclusion on petitioner's principal argument we need not consider petitioner's alternative argument that it became the constructive owner of Snellstrom's assets on Apr. 13, 1964, when it became fully responsible for the subsidiary's operations and liabilities.

Respondent contends that petitioner's holding period for the timber rights commenced when Snellstrom was liquidated. Respondent argues that a parent corporation and its subsidiary are two separate entities, and thus, Cabax cannot be deemed the owner of Snellstrom's assets, for purposes of section 631(a), prior to the liquidation of Snellstrom. Respondent further urges that if we adopt his view that the purchase and subsequent liquidation of a subsidiary corporation in a section 334(b)(2) setting should be treated as one continuous transaction beginning with the stock purchase and concluding with the parent corporation's receipt of its subsidiary's assets at the liquidation, then section 1223(1) is not applicable. In his view, since the successive steps employed to acquire Snellstrom's assets are treated as one under section 334(b)(2), i.e., the purchase of the assets, the holding period of the assets should not begin until the parent receives them in liquidation.

Section 631(a) provides that if a taxpayer so elects on its return, the cutting of timber during such year by the taxpayer who owns or has the contract right to cut timber shall be considered as a sale or exchange of the timber cut during the year, provided the taxpayer has owned such timber or the contract right to cut such timber for more than 6 months before the beginning of such year.

Section 1231 provides that if the recognized gains on sales or exchanges of property used in the trade or business (plus gains from involuntary conversions) exceed the recognized losses from such sales, exchanges, and conversions, such gains shall be considered as gains from sales or exchanges of capital assets held for more than 6 months (i.e., long-term capital gains). For purposes of section 1231 timber with respect to which section 631 applies is included within the term "property used in the trade or business." Sec. 1231(b)(2).

Pursuant to the above provisions petitioner would be entitled to report its gains on the timber cut under the cutting contracts it acquired from Snellstrom as long-term capital gain if it can be considered to have owned those contracts for more than 6 months prior to January 1, 1965.

Section 1223(1) [4] provides that in determining the period for which the taxpayer has held property received in an exchange, there shall

---

[4] SEC. 1223. HOLDING PERIOD OF PROPERTY.

(1) In determining the period for which the taxpayer has held property received in an exchange, there shall be included the period for which he held the property exchanged if, under this chapter, the property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged, and, in the case of such exchanges after March 1, 1954, the property exchanged at the time of such exchange was a capital asset as defined in section 1221 or property described in section 1231. For purposes of this paragraph—

(A) an involuntary conversion described in section 1033 shall be considered an exchange of the property converted for the property acquired, and

(B) a distribution to which section 355 (or so much of section 356 as relates to section 355) applies shall be treated as an exchange.

be included the period for which it held the property exchanged if the property has the same basis in its hands as the property exchanged. These requirements for "tacking" the holding period of the stock of Snellstrom acquired by petitioner in April of 1964 to the holding period of the timber-cutting contracts it received upon liquidation of Snellstrom in April of 1965, would appear to be met if the timber-cutting contracts had the same basis in petitioner's hands as did the property exchanged therefor, i.e., the stock of Snellstrom.

Section 331(a)(1) provides that amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. Assuming for the moment that under this section the cutting contracts were received by petitioner in exchange for the Snellstrom stock, the next step is to determine petitioner's basis in the cutting contracts.

Section 334(a) provides in general that if property is received in a distribution in complete liquidation, and if gain or loss is recognized on receipt of such property, the basis of the property in the hands of the distributee is its fair market value at the time of distribution. Section 334(b)(1) provides, however, that if property is received by a corporation in complete liquidation of another corporation which qualifies for nonrecognition of gain or loss under section 332, the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor, except as provided in paragraph (2). Paragraph (2) provides an exception to the general rule, and whether that exception applies to the facts of this case, is the basic issue here involved.

Section 334(b)(2) [5] provides, for purposes of this case, that if property is received by a corporation in complete liquidation of another corporation and if the distribution is pursuant to a plan of

---

[5] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

\* \* \* \* \* \* \*

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

liquidation adopted after June 22, 1954, and not more than 2 years after the transaction next described, and stock of the distributing corporation possessing at least 80 percent of the total voting power and at least 80 percent of the total number of shares of all classes of stock was acquired by the distributee by purchase during a 12-month period beginning with the date of the first acquisition by purchase, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. The facts of this case appear to meet the requirements of section 334(b)(2) so that petitioner's basis in the timber-cutting contracts is the same as its adjusted basis in the Snellstrom stock. Petitioner "purchased" 98 percent of the stock of Snellstrom, as defined in section 334(b)(3), on April 3, 1964, and the cutting contracts were received by petitioner in a complete liquidation of Snellstrom pursuant to a plan of liquidation adopted after 1954 and within 2 years after petitioner acquired more than 80 percent of all of Snellstrom's stock within 12 months after the date it first purchased any Snellstrom stock.

Now tracking back through the provisions of the various sections described above, it would appear, patently at least, that petitioner was entitled to report its gain from cutting timber under the cutting contracts received from Snellstrom as long-term capital gain under section 1231. Inasmuch as petitioner's basis in the cutting contracts was the same as its basis in the Snellstrom stock (sec. 334(b)(2)) and the cutting contracts are considered to have been received in an exchange under section 331(a)(1), petitioner would appear to be entitled to tack its holding period of the Snellstrom stock onto its holding period of the cutting contracts under section 1223(1). Since petitioner acquired the Snellstrom stock in April of 1964, the holding period of the cutting contracts would also start in April of 1964, which was more than 6 months prior to the start of 1965, the year in which petitioner cut the timber here involved. Petitioner having made the election on its 1965 return provided for in section 631(a) the timber cut in 1965 is considered to be property used in its trade or business under section 1231(b)(2) and the gains realized thereon are considered to be gain from the sale or exchange of capital assets held for more than 6 months under section 1231(a), or long-term capital gain as claimed by petitioner.

Despite the rather clear language of the statutes involved, which points to a decision in petitioner's favor, respondent argues that an exchange within the meaning of section 1223(1) has not occurred because the principles codified in section 334(b)(2) permitting a substituted basis do not recognize the assets as being received in exchange; that it would be inconsistent with the purpose of section

1223(1) to treat the section 334(b)(2) situation as a purchase of assets resulting in a stepped-up basis "and also to tack on part of the acquired corporation's holding period." In the first place petitioner is not seeking to tack on Snellstrom's holding period of the cutting contracts but only to tack on its own holding period of the stock, i.e. to commence its holding period at the time it made its investment to acquire the assets of Snellstrom. Secondly, we cannot agree that the principles codified in section 334(b)(2) do not recognize the assets as having been received in an exchange within the meaning of section 1223(1). To accept that position requires writing into section 1223(1) an exception that is not there.

Section 334(b)(2) was first enacted in 1954 and was intended to be a codification of the judicial principles set forth in *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951), certiorari denied 342 U.S. 827 (1951). See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. A109 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 48 (1954).

Prior to 1954, the provisions of the 1939 Code technically forced the acquiring corporation to take a carryover basis in the distributed assets, regardless of how much or how little it paid for the subsidiary's stock. However, the substituted basis result was attainable in the courts under the *Kimbell-Diamond* doctrine which employed fictions and a subjective intent standard to determine if a substituted basis was warranted. See *United States* v. *M.O.J. Corporation*, 274 F. 2d 713 (C.A. 5, 1960); *United States* v. *Mattison*, 273 F. 2d 13 (C.A. 9, 1959); *Georgia-Pacific Corporation* v. *United States*, 264 F. 2d 161 (C.A. 5, 1959); *Commissioner* v. *Ashland Oil & R. Co.*, 99 F. 2d 588 (C.A. 6, 1938), certiorari denied 306 U.S. 661 (1939); *North American Service Co.*, 33 T.C. 677 (1960); *Orr Mills*, 30 T.C. 150 (1958); *Estate of James F. Suter*, 29 T.C. 244 (1957); *Montana-Dakota Utilities Co.*, 25 T.C. 408 (1955); *H. B. Snively*, 19 T.C. 850 (1953), affd. 219 F. 2d 266 (C.A. 5, 1955); *Kimbell-Diamond Milling Co.*, *supra; Koppers Coal Co.*, 6 T.C. 1209 (1946).

The purpose for enacting section 334(b)(2) was to provide a mechanical test for determining whether the *Kimbell-Diamond* doctrine is applicable in determining the basis of assets acquired by the circuitous route of acquiring the stock of the corporation which owned those assets and then liquidating that corporation. Under section 334(b)(2) any corporation fulfilling the conditions set out in it must take a substituted basis in the distributed assets of the liquidated subsidiary equal to the parent corporation's basis in the subsidiary's stock. The rationale of the provision assumes the stock of the liquidating corporation is priced to reflect the current value of its assets; and, thus, the

distributee corporation takes a basis in all of the assets received in liquidation equal to their fair market value instead of a carryover basis in the assets derived from the liquidating corporation's basis in them as required in section 334(b)(1). See H. Rept. No. 1337, *supra* at p. A100. Consequently, section 334(b)(2) has the effect of a double-edged sword; it requires the acquiring corporation to take a substituted basis in the distributed assets regardless of whether the corporation's basis in the subsidiary's stock is more or less than the subsidiary's basis in those assets.

We find nothing inconsistent with the purpose of section 334(b)(2) and the rationale of *Kimbell-Diamond* to permit the acquiring corporation to add to its holding period for the assets so acquired the time that it held the subsidiary's stock. In fact, it seems more consistent with the underlying theory of the statute, that the purchase of the stock was in fact the purchase of the assets, to do so. Also, applying the clear meaning of the statutory language leads to that result.

Respondent's objection to this line of reasoning is that the doctrine of *Kimbell-Diamond*, on which section 334(b)(2) is based, requires the series of steps employed to acquire the assets to be treated as one transaction, the purchase of naked assets. Accordingly, he reasons that the exchange aspect of a section 334(b)(2) liquidation is nonexistent under the rationale of the *Kimbell-Diamond* doctrine. With no exchange in the transaction, his position continues, the liquidation cannot meet the conditions of section 1223(1) and consequently there can be no tacking of holding periods. Coincidently, in support of his position that section 1223(1) is inapplicable, respondent asserts that the *Kimbell-Diamond* doctrine as refined in *Georgia-Pacific Corporation* v. *United States, supra,* treats the series of steps as one continuous transaction, and thus it remains "open" from the purchase of the subsidiary's stock to the final distribution in liquidation. Respondent contends that it is this pendent nature of the transaction which prevents the holding period of the assets from attaching prior to the liquidation.

As we see it, there are several infirmities in respondent's position. First, as we have established, the section 334(b)(2) exception does not dispense with the fact that a liquidation has taken place. *Madison Square Garden Corp.*, 58 T.C. 619 (1972). Since the liquidation has not been extirpated, then by the plain language of sections 331(a) and 332, the liquidation qualifies as an exchange. Secondly, we think that respondent reads too much into the holdings of the cases he cites. Those cases address only the problem of what basis attaches to assets received in a liquidation under special circumstances. They do not appear to contemplate or anticipate any use of the *Kimbell-Diamond* doctrine to determine holding period. Furthermore, even if we engage

in respondent's line of reasoning, we find that the legal fiction of the doctrine would not only abolish the existence of the liquidation exchange but would also dispense with the purchase of the stock in the subsidiary. Extending this to the final step, it follows that the purchase of the stock actually is the purchase of the assets,[6] with the holding period attaching at that time, and the liquidation no more than a formalistic measure employed to reduce the then-owned assets to petitioner's possession. In short, the significance of the series of steps is effectuated with the performance of the first step. Cf. *George A. Roesel*, 56 T.C. 14 (1971). The conclusion then belies the consistency of respondent's position.

By linking section 334(b)(2) to section 1223(1), petitioner becomes entitled to no more than the other potential participants in a complete tax-free liquidation of an 80-percent subsidiary. In section 332 situations where a parent corporation fails to come within the provisions of section 334(b)(2), it takes a carryover basis in the distributed assets under section 334(b)(1) and is permitted to tack the subsidiary's holding period for the assets to that of its own under section 1223(2). *Frederick Steel Co.*, 42 T.C. 13 (1964), reversed on other grounds 375 F. 2d 351 (C.A. 6, 1967), certiorari denied 389 U.S. 901 (1967); Rev. Rul. 70–6, 1970–1 C.B. 172. Similarly, where a minority shareholder receives assets in exchange for his stock in a section 332 liquidation, he may elect to come within the provisions of section 333, in which case he takes a substituted basis, equal to his basis in the liquidating corporation's stock, under section 334(c). In a special ruling, dated May 10, 1956, the Commissioner determined that under such circumstances a section 333 shareholder may tack the holding period of his stock in the liquidating corporation to that of his holding period in the distributed assets.

Finally, not only do we believe that our decision obtains the proper legal result in holding that petitioner may avail itself of section 1223(1), but it also comports with the equitable motives of Congress manifested in its enactment of section 334(b)(2). For we hold that an acquiring corporation, Cabax in this case, is treated as if it had been able to purchase the naked assets of its subsidiary as of the date it was forced to buy most of the subsidiary's stock to obtain the assets in an indirect manner. Such treatment is afforded by the basis provisions of section 334(b)(2), and our decision here is simply a logical extension of that purpose. Here, petitioner has not gained any

---

[6] It is noteworthy that respondent's regulations, sec. 1.334–1(c)(4), Income Tax Regs., require adjustments to the parent corporation's basis in the subsidiary's stock to reflect the operations of the subsidiary during the interim period prior to liquidation. Such adjustments demonstrate that the date of the stock purchase is the effective date of the asset acquisition.

unwarranted tax benefits for it is clear that Cabax may tack only its own holding periods, that of the Snellstrom stock to the assets received in liquidation, and, therefore, it receives no unwarranted benefit from Snellstrom's prior ownership of the timber contracts.[7]

Respondent also argues that inasmuch as petitioner did not have the right to cut and sell timber under the Snellstrom contracts on its own account until Snellstrom was liquidated on April 30, 1965, petitioner was not entitled to make the section 631(a) election for 1965. Respondent relies on section 1.631–1(b)(1), Income Tax Regs., and on *Carlen* v. *Commissioner*, 220 F. 2d 338 (C.A. 9, 1955), affirming 20 T.C. 573 (1953), in support of his argument. Section 631(a) permits the election to be made "by a taxpayer who owns, or has a contract right to cut, such timber." The regulation, in defining who has the right to make the election, provides that in order to have a "contract right to cut timber" within the meaning of section 631(a), a taxpayer must have a right to sell the timber cut under the contract *on his own account* or to use such cut timber in his trade or business. Quoting the Tax Court opinion, the court, in *Carlen* v. *Commissioner, supra,* said:

The statute speaks of the cutting of timber for sale by a taxpayer who has a right to cut such timber. To us this means that the taxpayer who would claim the benefit of the statute must be the one who has not only the right to cut but also the right to sell on his own account. * * *

Petitioner points out, correctly we think, that the regulation and the *Carlen* case are concerned with the difference between a logging contractor, who has no beneficial interest in the timber and is not entitled to make the election, and an owner-logger who has the right to cut and sell timber for his own account. We do not believe the rationale of the regulation or the *Carlen* case precludes petitioner from claiming the benefits of section 631(a) under the circumstances here involved. It is clear from the evidence in this case that, under the rationale of *Kimbell–Diamond Milling Co., supra,* petitioner acquired a beneficial interest in the timber at the time it purchased the Snellstrom stock, and that that was its purpose in purchasing the stock. Furthermore, it seems clear that under section 331(a)(1) the cutting contracts received by petitioner upon liquidation of Snellstrom shall be treated as payment in exchange for the Snellstrom stock so that section 1223(1) applies and permits the "tacking" of petitioner's

---

[7] This case deals solely with the question of the proper holding period of certain assets Snellstrom owned at the time its stock was purchased. We do not herein decide the question of the holding period of assets a subsidiary acquires *after* the purchase of any part of its stock.

holding period of this stock to the holding period of the property exchanged therefor, i.e., the cutting contracts.

Since the parties have stipulated that petitioner qualifies for an election under section 631(a) if it is entitled to a section 1223(1) holding period, we are relieved of discussing that issue at this time.

*Decision will be entered for the petitioner.*