**In the Matter of CHROME PLATE, INC., Bankrupt.**

**CHROME PLATE, INC., Appellant,**

v.

**DISTRICT DIRECTOR OF INTERNAL REVENUE, United States of America, Appellee.**

**No. 77–3402.**

United States Court of Appeals, Fifth Circuit.

April 2, 1980.

---

John Dean Harris, San Antonio, Tex., for appellant.

Jamie C. Boyd, U. S. Atty., San Antonio, Tex., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, App. Section, Jonathan S. Cohen, R. Bruce Johnson, Ernest J. Brown, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before AINSWORTH, INGRAHAM and GARZA, Circuit Judges.

GARZA, Judge:

In this case, the court must determine two issues. First, we must decide whether the corporate taxpayer herein qualifies for a cost basis under 26 U.S.C. § 334(b)(2). Second, the court is presented with the question of whether a certain judicially created rule under the 1939 Internal Revenue Code, known as the *Kimbell-Diamond* doctrine, retains continuing viability under the 1954 code. We resolve both issues in the negative.

The present situation concerns the acquisition of six aircraft businesses owned or controlled by Clarence E. Page and the subsequent tax consequences. In 1972, the Appellant, Chrome Plate, Inc. [Chrome Plate] was a corporation engaged in the business of chrome plating aircraft cylinders. The six corporations [the Page corporations] were engaged in the sale and repair of airplanes and airplane engines. On December 12, 1972, Page Industries of Oklahoma, Inc. [PIOI] was created. On December 15, 1972, Chrome Plate Industries, Inc. [CPI] was formed, which was a wholly owned subsidiary of Chrome Plate. Shortly thereafter, PIOI issued 1,000 shares of its stock to CPI. On December 28, 1972, all of the stock in the Page corporations was transferred to CPI.[1] In return for the stock, CPI paid $850,000 in cash and notes.

Immediately after the acquisition of the Page corporations stock, CPI transferred the Page corporations stock to PIOI in exchange for 849,000 shares of PIOI common stock. This transaction rendered PIOI a wholly owned subsidiary of CPI. The following day, December 29, 1972, the Page corporations were liquidated, and PIOI succeeded to their assets.

Upon the liquidation, PIOI stepped up the basis of the acquired assets from their original cost to Page [2] to the cost to PIOI of $849,000. Chrome Plate filed a consolidated income tax return with CPI and PIOI for the taxable year 1973. Following the filing in bankruptcy by Chrome Plate in 1975, the Internal Revenue Service [IRS] claimed that Chrome Plate's basis in the Page corporations' assets should have been the same as the basis in the Page corporations stock.[3] On cross motions for partial summary judgment regarding the basis of the Page corporations stock, the bankruptcy judge ruled in favor of Chrome Plate. On appeal to the district court, the decision of the bankruptcy judge was reversed. *Chrome Plate, Inc. v. District Director of Internal Revenue*, 442 F.Supp. 1023 (W.D.Tex.1977).

## I. THE BASIS UNDER THE INTERNAL REVENUE CODE

26 U.S.C. § 331(a)(1) provides the general rule regarding a complete liquidation of a corporation. § 331(a)(1) states:

Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

26 U.S.C. § 1001(c) provides that the entire amount of the gain or loss on the sale or exchange of stock shall be recognized except in certain situations. *See* B. Bittker

1. An individual named O. J. Butts owned 20% of the stock in one of the corporations, Page Air Parts, Inc. He, too, transferred his stock to CPI as part of the instant transaction. Thus, after the CPI-Page corporations transaction, CPI owned all of the stock of the Page corporations.

2. In the instant case, the basis of the stock in the hands of the Page corporations was approximately $250,000.

3. The facts leading to the institution of the IRS's claim are a bit more detailed. CPI had apparently sold some of the assets from the Page corporations, which possessed the stepped-up basis. In its consolidated 1974 income tax return, Chrome Plate filed a claim for refund of taxes based upon a net operating loss carryback from the year ended December 31, 1973. In 1975, Chrome Plate filed under Chapter XI of the Bankruptcy Act. In November of 1976, the IRS filed a claim in bankruptcy court alleging a deficiency in income taxes. The IRS alleged that the net operating loss carryback should be decreased because Chrome Plate claimed an incorrect basis regarding the Page corporations transaction in 1973. The IRS also sought a recoupment of tentative overassessment allowed as a result of the carryback filed in 1974. The recoupment claim regarding an allegedly bad debt claim is not before this court. The only issue before the court concerns the basis in the Page corporations stock.

& J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 11.40, at 11–30 (4th ed. 1979) [hereinafter Bittker & Eustice]. One of the exceptions to § 1001(c), which is applicable in this case is 26 U.S.C. § 332. If the conditions of § 332 are met, the parent corporation will realize no gain or loss on the receipt of property distributed in complete liquidation of a subsidiary.[4] To qualify, a parent corporation[5] must possess at least 80% of the total combined voting power of all classes of stock and own at least 80% of the total number of shares of all other classes of stock. 26 U.S.C. § 332(b)(1). The distribution by the subsidiary must be in complete cancellation or redemption of its stock, and a complete transfer must occur within the taxable year. 26 U.S.C. § 332(b)(2). Finally, the distribution must be made pursuant to a plan of liquidation under which the transfer of all the property be completed within three years from the close of the taxable

year during which the first of any series of distributions is made. 26 U.S.C. § 332(b)(3).

The basis provisions applicable to § 332 transactions are found in 26 U.S.C. § 334. The general basis utilized upon a liquidation of a subsidiary under § 332 is a carryover, i. e., the basis of the property in the hands of the parent shall be the same as it would be in the hands of the subsidiary. 26 U.S.C. § 334(b)(1).[6] § 334(b)(1) provides for one exception to the above basis rule, which is found in § 334(b)(2).[7] See Cabax Mills v. C.I.R., 59 T.C. 401, 406 (1972); Bijou Park Properties, Inc. v. C.I.R., 47 T.C. 207, 214 (1966). When applicable, the exception allows the parent corporation to take a cost basis in the property as opposed to a carryover basis. In other words, under the exception to § 334(b)(1), the basis of the property in the hands of the parent will be equal to the cost of the stock purchased with certain possible adjustments.[8]

4. This transaction, where a subsidiary is liquidated into a parent, is also called an "upstream merger." The rationale for the granting by Congress of this tax status was that statutory mergers are given such a status. Since a § 332 type of transaction amounts to a "practical" or "upstream" merger, Congress bestowed upon it the same benefits given to statutory mergers. See Bittker & Eustice ¶ 11.40, at 11–31.

5. The pertinent statutes speak in terms of the receiving corporation (the distributee) and the distributing corporation, rather than "parent" and "subsidiary." For purposes of clarity, however, the latter two terms will be used in this opinion.

6. § 334(b)(1) provides as follows:
(1) In general.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. If property is received by a corporation in a transfer to which section 332(c) applies, and if paragraph (2) of this subsection does not apply, then the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

7. § 334(b)(2) provides in pertinent part as follows:
(2) Exception.—If property is received by a corporation in a distribution in complete

liquidation of another corporation (within the meaning of section 332(b)), and if—
(A) the distribution is pursuant to a plan of liquidation adopted not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and
(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of—
(i) the date of the first acquisition by purchase of such stock, or
(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made.

8. The regulations under § 334(b)(2) list the adjustments that must be made in reaching the parent's final adjusted basis. See Int.Rev.Regs.

A cost basis under § 334(b)(2) may be used if certain requirements are met regarding property received by a corporation in a distribution in complete liquidation of another. The parent corporation must acquire by purchase stock of the subsidiary possessing at least 80% of the total voting power of all classes of stock entitled to vote and at least 80% of the total number of shares of all other classes of stock during a twelve month period, beginning with the date of the first purchase of stock. § 334(b)(2)(B)(i). The distribution must be made pursuant to a plan of liquidation adopted not more than two years after the date of the above transaction. § 334(b)(2)(A).

The need for a "purchase" under § 334(b)(2) is to insure that a taxable transaction has occurred. In other words, Congress in enacting § 334(b)(2) did not want to allow corporate taxpayers who had acquired assets through transactions which avoided taxation to also receive the benefits of a stepped-up cost basis. *See Broadview Lumber Co., Inc. v. United States*, 561 F.2d 698, 713 (7th Cir. 1977); Bittker & Eustice ¶ 11.44, at 11–44. The term "purchase", as used in § 334(b)(2)(B), is defined in § 334(b)(3) as any acquisition of stock except in three circumstances. For present purposes, only one of these circumstances is applicable. The term "purchase" does not include a transaction in which the stock is "acquired in an exchange to which [ 26 U.S.C.] section 351 applies  . . . ." § 334(b)(3)(B).

26 U.S.C. § 351 provides that:

No gain or loss shall be recognized if property is transferred to the corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in § 368(c) ) of the corporation.

26 U.S.C. § 368(c) defines the term "control" as the ownership of stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote and at least 80% of the total number of shares of all the classes of stock of the corporation.

Thus, a corporate taxpayer may receive a cost basis in liquidated assets merely by following the dictates of § 334(b)(2). It is a completely objective test in which the intent of the receiving corporation is immaterial. *See Broadview Lumber Co., Inc. v. United States*, 561 F.2d at 711; *Boise Cascade Corporation v. United States*, 288 F.Supp. 770, 774 (D.Idaho 1968), *aff'd per curiam*, 429 F.2d 426 (9th Cir. 1970); Bittker & Eustice ¶ 11.44, at 11–48. If a corporate transaction complies with the provisions of § 334(b)(2), it receives a cost basis. Otherwise the transaction falls back under § 334(b)(1), and the parent obtains a carryover basis.

The transfer of cash and notes by CPI for the stock of the Page corporations clearly qualified as a "purchase" as defined in § 334(b)(3). The sellers of the Page corporations stock clearly realized a gain upon that sale. It was the next step taken by CPI which tainted the transaction and caused this litigation.

The parties in this case concede and the trial court found that the exchange of the Page corporations stock for the PIOI stock qualified as a § 351 transfer. The control requirements were satisfied, and there was no actual generation of income for either party. *See E. I. DuPont de Nemours and Company v. United States*, 471 F.2d 1211, 1214, 200 Ct.Cl. 391 (1973). Since the term "property" encompasses whatever may be transferred, *see Hempt Bros., Inc. v. United States*, 354 F.Supp. 1172, 1175 (M.D.Pa.1973), *aff'd*, 490 F.2d 1172 (3d Cir. 1974), *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974), this court agrees that the stock for stock exchange between CPI and PIOI qualified as a § 351 transfer.

---

§ 1.334–1(c)(4). The purpose for these adjustments is to place the party in the same basis position as if that party had liquidated immediately after acquiring the stock. *See* Bonovitz, *Problems in Achieving Parity in Tax Treatment*

*Under Sections 337 and 334(b)(2)*, N.Y.U. Proc. of the 34th Inst. on Fed. Tax. 57, 89 (1976) [hereinafter Bonovitz]. In the present case, however, the issue of adjusted basis is not present.

**996**

■ The Appellant has suggested to this court that it disregard the § 351 exchange as superfluous to the overall transaction. This court may not do so. To qualify under § 334(b)(2), there must be strict compliance with its requirements. The Appellant argues correctly that if CPI had received the liquidated assets directly from the Page corporations, the transaction would have qualified under § 334(b)(2). This court, however, may not ignore the form of the transaction deliberately chosen by the taxpayer.[9] *See Yoc Heating Corporation v. C.I.R.*, 61 T.C. 168, 175 (1973).

■ Although CPI acquired the stock by purchase, CPI could no longer be regarded as the acquiring corporation following the § 351 transfer. At that point, PIOI rather than CPI acquired the liquidated assets. There is no doubt that PIOI satisfied the time limit and stock ownership requirements of § 334(b)(2). PIOI did receive property "in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)) . . . ." 26 U.S.C. § 334(b)(2). Nonetheless, PIOI, the receiving corporation, acquired the stock "in an exchange to which section 351 applies . . . ." 26 U.S.C. § 334(b)(3)(B). Under a clear reading of the statute, neither CPI nor PIOI qualify under § 334(b)(2).

■ Appellant also argues that PIOI, CPI and itself should be regarded as a single entity since a consolidated income tax return had been filed. The filing of such a return, however, is insufficient to destroy the separate existence of the corporations. As long as a corporation conducts some type of business activity, it remains a separate taxable entity. *See Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438–39, 63 S.Ct. 1132, 1133–1134, 87 L.Ed. 1499 (1943). A parent corporation possesses a separate existence and is treated separately from a subsidiary unless there are circumstances justifying disregard of the corporate entity. *See Evans v. C.I.R.*, 557 F.2d 1095, 1099 (5th Cir. 1977). *See also Western Beef, Inc. v. Compton Investment Co.*, 611 F.2d 587 at 590 (5th Cir. 1980) (a division of a corporation is not a separate legal entity, apart from the corporation, but a subsidiary corporation is separate); *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979) (fact that parent corporation owned 100% of subsidiary's stock is not sufficient by itself to merge the two for purposes of establishing an agency relationship). In order to disregard the corporate entity, there needs to be a showing that separativeness of functions was not maintained. *See Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974). Such a showing does not exist here. There has been no contention that the three corporations did not carry out separate functions nor that any of them was not created for valid business reasons.

■ Thus, under the requirements of § 334(b)(2), the Appellant as well as its subsidiaries have failed to qualify. Regardless of the Appellant's reasons for structuring the transaction as it did, it has not complied with the cost basis exception in § 334, and under the statute it must receive a carryover basis.

## II. THE KIMBELL–DIAMOND DOCTRINE

■ The Appellant also raises the claim that this court has the right to ignore the

---

9. In its briefs and in the record in the court below, the reasons for the inclusion of the § 351 transfer in the transaction are never made clear. The asserted rationale was that it had been structured to fulfill the business and tax needs of all parties involved. At oral argument, counsel for Chrome Plate was asked why PIOI had received the liquidated assets rather than CPI. Counsel informed the court that Appellant did so for two reasons. First, counsel stated that the liquidated assets were inventory. Counsel went on to explain that if CPI had received the assets, they would have been commingled with CPI's other inventory. Counsel argued that it then would have been difficult to procure a release every time CPI wanted to sell some of the acquired assets. Second, counsel stated that a multimillion dollar law suit had been pending against one of the Page corporations at the time. Appellant feared that if the suit had been successful, CPI, as the parent, could have been found liable. This court accepts the above reasons as true and assumes that CPI possessed legitimate purposes for the transaction.

transitory steps of the instant transaction and allow the taxpayer a cost basis based upon his intent to acquire the assets of the Page corporations. For this proposition, Appellant relies upon *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), *aff'd per curiam*, 187 F.2d 718 (5th Cir. 1951), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951). The *Kimbell-Diamond* doctrine provided that when a taxpayer, solely interested in acquiring a corporation's assets, purchased stock and then liquidated the acquired corporation, the transaction would be viewed as a purchase of assets and the various steps would be considered a single transaction.

The *Kimbell-Diamond* doctrine was created to correct an inequity in the 1939 Internal Revenue Code. In the 1939 code, § 332's predecessor was found in 26 U.S.C. § 112(b)(6) and was very similar to the present provisions. The basis provision for § 112(b)(6), however, provided in pertinent part that:

> If the property was received by a corporation upon a distribution in complete liquidation of another corporation within the meaning of section 112(b)(6), then the basis shall be the same as it would be in the hands of the transferor.

26 U.S.C. § 113(a)(15).

There was no counterpart to the present § 334(b)(2) in the 1939 code. Thus, under the old code, an acquiring corporation was forced to take a carryover basis in the assets, regardless of the price paid for the distributing corporation's stock. *See Cabax Mills v. C.I.R.*, 59 T.C. 401, 408 (1972). The seeds of *Kimbell-Diamond* were sowed in *C.I.R. v. Ashland Oil & Refinery Co.*, 99 F.2d 588 (6th Cir. 1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939), in which the Sixth Circuit held that a transaction involving solely an acquisition of property must be viewed as a whole "and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority." *Id.* at 591.

With the *Ashland* precedent in mind, the Tax Court in 1950 was faced with a situation where a fire had destroyed a milling company's assets. With the fire insurance proceeds, the company acquired 100% of the stock of another milling company. The subsidiary company was then liquidated, and the parent received the assets. The tax court held that when viewed as a single transaction, it amounted to a purchase of assets, and the taxpayer would receive a cost basis rather than a carryover. *Kimbell-Diamond*, 14 T.C. at 80. The *Kimbell-Diamond* doctrine gave both the taxpayer and the IRS a judicial exception to the statutory carryover basis rule and became an often used procedure in cases under the 1939 code. *See The South Bay Corporation v. C.I.R.*, 345 F.2d 698, 703 (2d Cir. 1965); *United States v. M.O.J. Corporation*, 274 F.2d 713, 717 (5th Cir. 1960); *United States v. Mattison*, 273 F.2d 13, 17 (9th Cir. 1959); *Georgia Properties Co. v. Henslee*, 138 F.Supp. 587, 590 (M.D.Tenn.1955).

In 1954, Congress added § 334(b)(2) to incorporate "rules effectuating principles derived from Kimbell-Diamond Milling Company. . . ." S.Rep.No.1622, 83d Cong., 2d Sess. (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4894. The legislative history, unfortunately, is not totally clear on whether § 334(b)(2) was enacted to supplant the *Kimbell-Diamond* doctrine or merely to borrow from it. Throughout the committee proceedings, the only mention of this is that § 334(b)(2) "effectuates" the principles of *Kimbell-Diamond*. *See* S.Rep.No.1622, 83d Cong., 2d Sess. (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4679, 4894; H.R.Rep.No.1337, 83d Cong., 2d Sess. (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4017, 4063, 4247.

The IRS has opposed the application of the *Kimbell-Diamond* doctrine to situations arising under the 1954 code.[10] In light of

---

**10.** The IRS manual lists the use of the *Kimbell-Diamond* doctrine as a "prime issue," one that it will litigate and will not usually concede or compromise. *See* [1980] 3 Stand.Fed.Tax Rep. (CCH) ¶ 2434; 2 J. Rabkin & M. Johnson, Federal Income, Gift and Estate Taxation § 23.-11(4) [hereinafter Rabkin & Johnson]. *But see American Potash & Chemical Corporation v.*

this conflict and unclear legislative history, the courts had grappled for almost two decades with the continuing vitality of the *Kimbell-Diamond* rule under the 1954 code. Without making an affirmative decision, the Fifth Circuit seemed to imply that the doctrine was still viable under the 1954 code in *Griswold v. C.I.R.*, 400 F.2d 427, 431 (5th Cir. 1968). As late as 1973, the tax court had not decided whether the doctrine could still be used in post-1954 situations. *See Yoc Heating Corporation v. C.I.R.*, 61 T.C. 168, 176 (1973); *Kass v. C.I.R.*, 60 T.C. 218, 223 n. 9 (1973).

In 1968, however, the Court of Claims affirmatively held that Congress did not intend to eliminate the *Kimbell-Diamond* doctrine by enacting § 334(b)(2). *American Potash & Chemical Corporation v. United States*, 399 F.2d 194, 207, 185 Ct.Cl. 161 (1968). The Court of Claims held that the rationale for the rule was based upon the notion that substance should prevail over form. *Id.* The Court of Claims concluded that Congress meant to inject a degree of certainty into the area of tax law by offering an objective route for obtaining a cost basis without the need for showing intent to acquire assets. *Id.* at 207–08. The Court of Claims found it anomalous that § 334(b)(2) applies only to corporate taxpayers, allowing individual taxpayers to avail themselves of the doctrine. *Id.* at 208. The Court of Claims also discerned no specific direction by Congress that the doctrine was defunct and, thus, refused to abolish it. *Id.* at 209. *See also Rose Hills Memorial Park Association v. United States*, 463 F.2d 425, 433, 199 Ct.Cl. 6 (1972), *cert. denied*, 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973) (affirming the viability of the *Kimbell-Diamond* doctrine).

Shortly thereafter, a number of circuits refused to follow the holding in *American Potash*. In *Supreme Investment Corporation v. United States*, 468 F.2d 370, 377 (5th Cir. 1972), this court held that § 334(b)(2) is a codification of principles derived from the *Kimbell-Diamond* doctrine. This court also held that in enacting § 334(b)(2), Congress made a major change by substituting a series of objective tests in place of the taxpayers subjective intent to obtain corporate assets. *Id. Supreme Investment* did not abolish the doctrine, however. Additionally, the facts in that case are distinguishable from the present case, since in *Supreme Investment*, the taxpayer had met all the requirements of § 334(b)(2).

The Ninth Circuit has been faced with the *Kimbell-Diamond* doctrine twice in *Pacific Transport Co. v. C.I.R.*, 483 F.2d 209 (9th Cir. 1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974), and *Boise Cascade Corporation v. United States*, 288 F.Supp. 770 (D.Idaho 1968), *aff'd per curiam*, 429 F.2d 426 (9th Cir. 1970). In *Boise Cascade*, the Ninth Circuit summarily affirmed a district court case which held that § 334(b)(2) eliminated the subjective intent test of *Kimbell-Diamond*. In *Pacific Transport*, the Ninth Circuit held that the *Kimbell-Diamond* philosophy is no longer controlling. *Pacific Transport Co. v. C.I.R.*, 483 F.2d at 213. Again, however, both cases involved transactions which specifically qualified under § 334(b)(2).

The Seventh Circuit has also dealt with the application of the *Kimbell-Diamond* doctrine in *Broadview Lumber Co., Inc. v. United States*, 561 F.2d 698 (7th Cir. 1977). The facts in that case clearly involved a § 334(b)(1) transaction in which the government sought to use the *Kimbell-Diamond* doctrine to force the taxpayer to receive a cost basis. The Seventh Circuit held that the *Kimbell-Diamond* doctrine is inapplicable "in cases falling within the ambit of § 334(b)(2)," *id.* at 712 and n. 30, but it did not rule out the possibility that it might apply in situations where § 334(b)(2) is inapplicable. *Id.* at 712, 714.

United States, 402 F.2d 1000, 1001 n. 1, 185 Ct.Cl. 161 (1968) (IRS no longer argued that the *Kimbell-Diamond* approach is not viable but rather that it was inapplicable to the facts of the case); Rev.Rul. 74–35, 1974–1 C.B. 85 (In language implicitly recognizing the doctrine, IRS refers to Rev.Rul. 67–274, 1967–2 C.B. 141, which represented "an application of the *Kimbell-Diamond* principle.").

In 1978, the Tax Court, deciding the point which it left unanswered in *Yoc Heating Corporation v. C.I.R.*, 61 T.C. 168 (1973), held that the only exception to § 334(b)(1) is found in § 334(b)(2), and, therefore, the *Kimbell-Diamond* doctrine has been abolished. *International State Bank v. C.I.R.*, 70 T.C. 173, 180–81 (1978).

■ There is no doubt that in situations where the objective requirements of § 334(b)(2) have been met, there is no room for the *Kimbell-Diamond* doctrine. It is equally clear that § 334(b)(2) is a codification of the *Kimbell-Diamond* doctrine and was meant to allow a cost basis automatically without the need for proving the intent to acquire assets. *See Broadview Lumber Co.*, 561 F.2d at 711; *Supreme Investment*, 468 F.2d at 377; *Madison Square Garden Corporation v. C.I.R.*, 500 F.2d 611, 612 (2d Cir. 1974); 2 Rabkin & Johnson § 23.11(4). § 334(b)(2) is a mandatory and not an elective section. *See Broadview Lumber Co.*, 561 F.2d at 711, *Supreme Investment,* 468 F.2d at 377. If a corporate taxpayer complies with the procedures in § 334(b)(2) it must take a cost basis, even if it never had the initial intent to acquire the assets or receive a cost basis. *See Supreme Investment*, 468 F.2d at 377.

However, this court is not dealing with a situation where a corporation has fulfilled the statutory requirements of § 334(b)(2). Rather, we are asked to apply the *Kimbell-Diamond* doctrine in a factual situation in which § 334(b)(2) has not been met. Outside of the Court of Claims and the Tax Court, the other courts which have dealt with the doctrine have never affirmatively held either way regarding the present factual scenario.[11]

The *Kimbell-Diamond* doctrine was a necessary outlet for the strict language of § 334's predecessor. Clearly, a purchase of stock and subsequent liquidation by the same corporation done wholly with the intent to acquire assets was no different than a direct purchase of assets, which resulted in a cost basis. *See Georgia-Pacific Corporation v. United States*, 264 F.2d 161, 163 (5th Cir. 1959).

Congress, however, recognized the need to codify such a practice and did so in 1954. § 113(a)(15) of the old code, which mandated the receipt of a carryover basis by a corporation upon the complete liquidation of another, became § 334(b)(1). Congress retained the carryover basis in such transactions "except as provided in paragraph (2). . . ." 26 U.S.C. § 334(b)(1). By 1954, Congress was well aware of the *Kimbell-Diamond* doctrine and its objective intent requirement, yet it provided for only that one exception to the carryover basis rule, found in § 334(b)(2). Congress included no provision allowing a subjective intent test to be used when § 334(b)(2) was not satisfied. Although the legislative history is opaque at best, it does demonstrate that Congress was inserting the principles of the *Kimbell-Diamond* doctrine in the statute.

■ By a plain reading of § 334(b)(1), however, it is apparent that Congress meant to codify the *Kimbell-Diamond* rule completely in § 334(b)(2). No other exception was enacted or acknowledged by Congress. The majority opinion of the Tax Court in *International State Bank*, thus, seems to be the correct interpretation of § 334.[12] Whenever property is received by

---

11. Bittker & Eustice suggest that the *Kimbell-Diamond* doctrine may still possess vitality in cases where the statutory requirements of § 334(b)(2) are not satisfied. Bittker & Eustice ¶ 11.44, at 11–48. *See also Bonovitz, supra*, at 112–13, writing before the 5th, 7th and 9th Circuits had rendered their decisions, in which he states that although a situation identical to the present one might not qualify under § 334(b)(2), the courts are reluctant to take a formalistic approach and will probably apply the doctrine. Since that publication, the courts have shown a reluctance to so apply the doc-

trine, and the Tax Court has clearly held against it.

12. Judge Tannenwald, concurring in *International State Bank*, joined by two other judges, was reluctant to discard the doctrine. Judge Tannenwald advocated that in situations where § 334(b)(2) is not followed, the tax court "should not be prevented from utilizing the flexibility which the *Kimbell-Diamond* doctrine affords." *International State Bank*, 70 T.C. at 182 (Tannenwald, J., concurring).

a corporation in a distribution in complete liquidation of another corporation pursuant to § 332, the receiving corporation must take a carryover basis, unless and only unless the transaction qualifies for a cost basis under § 334(b)(2).

The Court of Claims, in its defense of the doctrine, questions the logic of § 334(b)(2)'s applicability to corporations and not individual taxpayers. *American Potash*, 399 F.2d at 208. Although it may seem anomalous, that does not give this court the right to twist the meaning of a statute which clearly requires satisfaction of certain prerequisites before a cost basis may be obtained. Congress either ignored or chose to exclude the individual taxpayers, but we may not assume from either alternative that this court thus has the right to equalize the situation. Congress has specifically provided for corporate taxpayers, and we are bound by that legislation.

This court is completely cognizant of the fundamental tax concept that substance should be exalted over form. *See C.I.R. v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945); *United States v. Kennedy Construction Co. of NSB, Inc.*, 572 F.2d 492, 495 (5th Cir. 1978). The court is also aware that the *Kimbell-Diamond* rule was based upon the notion of substance over form. *Kimbell-Diamond*, 14 T.C. at 80. We cannot and do not refute this principle. In *Kimbell-Diamond*, it was a necessary tool to correct an apparent oversight by Congress. An appellate court, however, would be disserving itself and the taxpayers as well as committing legal dishonesty if, relying solely upon the notion that substance should prevail over form, it created additional exceptions to a statute which clearly corrected that prior oversight and provides for only one exception. The statute itself exalts form over substance. We may not act as a beneficent paternal

rectifier of legislation which is not constitutionally deficient. In light of the provisions of § 334, there is simply no room to utilize the substance over form doctrine. *See Griswold v. C.I.R.*, 400 F.2d 427, 431 (5th Cir. 1968) (noting that the form of a transaction often controls the tax consequences).

Thus, we hold definitively and absolutely that the *Kimbell-Diamond* doctrine is extinct under the 1954 code regarding corporate taxpayers. The doctrine has been codified in § 334(b)(2), which is now the sole exception to the application of a carryover basis to corporations following the complete liquidation of another corporation. Although today's decision extinguishing the *Kimbell-Diamond* doctrine cuts against the taxpayer herein, that does not intimate that the taxpayer will always meet with failure. Rather the mechanistic approach of § 334(b)(2) gives the corporate taxpayer an assurance that it will receive a cost basis if it only fulfills the statutory requirements. In truth, the *Kimbell-Diamond* doctrine itself was a double edged sword which could be and often was used by the IRS to require a taxpayer to receive a basis which the latter did not seek. *See Broadview Lumber Company*, 561 F.2d at 711 n. 28; *United States v. Mattison*, 273 F.2d at 17 n. 4.

This is a case in which it is quite fitting to apply Justice Holmes' oft cited phrase that "hard cases make bad law." *Northern Securities Co. v. United States*, 193 U.S. 197, 400, 24 S.Ct. 436, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). This case seems inequitable to the Appellant. Chrome Plate truly believed that its transaction would qualify under § 334(b)(2).[13] The sellers of the Page stock did realize a gain, and CPI did acquire the stock by purchase. Likewise, PIOI met all the mechanical requirements of the liquidation. But the same corporation that made the purchase did not receive the property due to the prohibited § 351 transaction. Even so, it may appear

---

**13.** Although the Appellant was clearly aware of § 334(b)(2), it cannot be faulted for its actions. When the transaction was planned and consummated, the only case law available was that of *American Potash*. Both the Appellant's ac-

countant and attorney relied upon that case and truly believed that a cost basis would be applicable pursuant to the *Kimbell-Diamond* doctrine.

inequitable to not retain the *Kimbell-Diamond* doctrine in such a case. But to do so would require a convoluted reading of § 334(b)(2), its purpose and its history. If we retained the *Kimbell-Diamond* doctrine in a hard case such as this one, we would undoubtedly be creating bad law. We refuse to do so.

We hold positively and conclusively that the *Kimbell-Diamond* doctrine is abolished in regard to corporate taxpayers, and the only opportunity to receive a cost basis in complete liquidation of a subsidiary is by fully complying with § 334(b)(2). In the present case, the Appellant will not be allowed a cost basis under § 334(b)(2) because of the inclusion of a § 351 transfer in the transaction. The Appellant is therefore required to take a carryover basis under § 334(b)(1).

AFFIRMED.